Seaied

# UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF FLORIDA

Noelia E. Valdes
Jacob-Franz: Dyck, Trustee of
Hagen Trust

          Plaintiffs

Vs

Central Mortgage Company
American Brokers Conduit
Maxine Cohen Lando
Galinda Boytchev
Ben-Ezra & Katz, P.A.
Deutsche Bank
American Home Mortgage Investment
Beacon Financial Mortgage Bankers
Jerald Bagley (Circuit Court Judge)
Robert J. Nemrow
Kahane & Associates, P.A.
Mortgage Electronic Registration System, Inc.
c/ Electronic  Data Systems Corp. (MERS)
Florida Bar Association
Harvey Rubin, Clerk of the
Circuit Court of the Eleventh Judicial Circuit of
Florida in and For Miami-Dade County
Denisse Baum 31955, Deputy Clerk
Miami Dade Sherriff Department
John Doe 1-5 and
Jane Doe 1-5
In their private capacity, in their corporate capacity and all
Marital assets

          Defendants

Case:
Demand Rule 38 F.R.C.P.
Demand for trial by
Jury of our Peers (Sovereigns)
Diversity (Rule 1332)
Title 28 Sections 1331, 1334

## 10-23917-CV Altonaga/Brown

FILED by _W.S_ D.C.

**OCT 2 8 2010**

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

# TEMPORARY RESTRAINING ORDER

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

Noelia E. Valdes
Jacob-Franz: Dyck, Trustee of
Hagen Trust
               Plaintiffs

           Vs

Central Mortgage Company
American Brokers Conduit
Maxine Cohen Lando
Galinda Boytchev
Ben-Ezra & Katz, P.A.
Deutsche Bank
American Home Mortgage Investment
Beacon Financial Mortgage Bankers
Jerald Bagley (Circuit Court Judge)
Robert J. Nemrow
Kahane & Associates, P.A.
Mortgage Electronic Registration System, Inc.
c Electronic Data Systems Corp. (MERS)
Florida Bar Association
Harvey Rubin, Clerk of the
Circuit Court of the Eleventh Judicial Circuit of
Florida in and For Miami-Dade County
Denisse Baum 31955, Deputy Clerk
Miami Dade Sherriff Department
John Doe 1-5 and
Jane Doe 1-5
In their private capacity, in their corporate capacity and all
Marital assets
               Defendants

FILED by _W.S_ D.C.

OCT 2 8 2010

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. – MIAMI

Case:
Demand Rule 38 F.R.C.P.
Demand for trial by
Jury of our Peers (Sovereigns)
Diversity (Rule 1332)
Title 28 Sections 1331, 1334

Sealed



---

# TEMPORARY RESTRAINING ORDER

---

**Affidavit**

We, Noelia E. Valdes, and Jacob-Franz: Dyck, are competent to testify and make this affidavit as a follower of Messiah, in the laws of the Almighty Supreme Court Creator, first and foremost and the laws of Man when they are not in conflict (Leviticus 18:3-4). Pursuant to Matthew 5:33-37 and James 5:12, C.I.R. v Ferguson U.S.C.A. 90-1430, let our yeas be yeas and nays nay, as supported by your Federal law 97-280, 96 Stat. 1211. We have personal knowledge of the matters as stated herein and hereby asseverate understanding the liabilities presented in your Briscoe v Lahue 46 U.S. 325.

**Plaintiffs**

Noelia Valdes, manager of Hagen Trust (a property in Miami-Dade County, Florida). Jacob-Franz: Dyck, Trustee of Hagen Trust (a property in Miami-Dade County, Florida).

**Defendants**

Central Mortgage Company, American Brokers Conduit, Maxine Cohen Lando, Galinda Boytchev, Ben-Ezra & Katz, P.A., Deutsche Bank, American Home Mortgage Investment, Beacon Financial Mortgage Bankers, Jerald Bagley (Circuit Court Judge), Robert J. Nemrow, Kahane & Associates, P.A., Mortgage Electronic Registration System, Inc., c/ Electronic Data Systems Corp. (MERS), Florida Bar Association, Harvey Rubin, Clerk of the Circuit Court of the Eleventh Judicial Circuit of Florida in and For Miami-Dade County, Denisse Baum 31955, Deputy Clerk Miami Dade Sherriff Department, John Doe 1-5 and Jane Doe 1-5 in their private capacity, in their corporate capacity and all Marital assets Defendants.

2

## Diversity of Citizenship

This action comes to this court for diversity of citizenship, Title 28, Section 1332, also 1331 and 1334, under Federal Rules of Civil Procedures, Rules 9 (b), Rule 60(b)(3), the discovery of the law and facts and upon the discovery of scheme to defraud the Plaintiffs. The Plaintiffs being natural born sovereign citizens while the defendants are all corporate fictions, working in some capacity for the STATE OF FLORIDA or the UNITED STATES, with Licenses to do business in FLORIDA. The Hagen Trust is under the Common Law Orange County, California Trust.

This action of a foreclosure in State Court is not in proper court because the STATE OF FLORIDA lacks jurisdiction. It does not possess any credit. All credit is vested in the UNITED STATES by virtue of the Credit Clause of the Constitution at, Article I section 8 sub section 2.

Jacob-Franz: Dyck is also the Minister of Health for the Washitaw Nation an indigenous nation registered under the United Nation Indigenous Economic Council. The UNITED STATES signed the following treaties to abide by the laws therein.

International Covenant on Civil and Political Rights
U.N.T.S No. 14668, vol. 999 (1976), p. 171;
Senate advice and consent: 138 Cong. Rec.
S4783 (April 2, 1992); 58 Fed. Reg.
45934-45942, No. 167. Aug. 31, 1993

International Convention on the Elimination of all Forms of Racial Discrimination
U.N.T.S. No. 9464
Senate advice and consent:
140 Cong. Rec. S76634 (June 24, 1994)

Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment
UN General Assembly RES 39/46. Annex
Senate advice and consent:
136 Cong. Rec. S17491-2 (October 2, 1990)

3

Genocide Convention Implementation Act of 1988
18 U.S Code s1091-1093

## Section I. Short Title.

This Act may be cited as the "Genocide Conventional Implementation Act of 1988"

Section II. Title 18 Amendments

(A)     In General- Title 18, United States Code, is amended by inserting after chapter 50 the following:

"Chapter 50A- Genocide"

## Section 1091 Genocide

(A)     "Basic Offense- Whoever, whether in time of peace or in time of war, in a circumstance described in subsection (d) of this section and with the specific intent to destroy, in whole or in substantial par, a national, ethnic, racial, or religious group as such"—

(1) "kills a member of that group;"

(2) "Causes serious bodily injury to a member that group;"

(3) "Causes the permanent impairment of the mental faculties of a member of the group through drugs, torture, or similar techniques;"

(4) "Subjects the group to conditions of life that are intended to cause physical destruction of the group in whole or in part;"

(5) "Imposes measures intended to prevent births within the group; or"

(6) "Transfer by force a child of the group to another group; or attempts to do so, shall be punished as provided in subsection (b) of this section."

(B)     "Punishment for Basic Offense- The punishment for an offense under subsection (a) of this section is"---

4

(1) "In the case of an offense under subsection (a) (1), a fine of not more than $1,000,000 and imprisonment for life; and"

(2) "A fine of not more than $1,000,000 or imprisonment for not more than 20 years, or both, in any other case."

(C)     "Incitement Offense- Whoever in a circumstance described in subsection (d) of this section directly and publicly incites another to violate subsection (a) of this section shall be fined not more than $500,000 or imprisoned not more than five years, or both."

(D)     "Required Circumstance for Offenses- The circumstance referred to subsections (a) and (c) of this section is that"—

(1) "The offense is committed within the United States or"

(2) "The alleged offender is a national of the United States (as defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)."

(E)     "Non- Applicability of Certain Limitations- Notwithstanding section 3282 of this title, in the case of an offense under subsection (a)(1) of this section, an indictment may be found or an information instituted at any time without limitation."

Section 1092 Relation To Other Remedies

(A)     "Nothing in this chapter"—

(1) "Precludes the application of State or local laws on the same subject or"

(2) "Creates any Federal civil remedy with respect to the conduct prohibited by this chapter"

(B)     "Clerical Amendment- The table of chapters at the beginning of part I of title 18, the United States Code, is amended by inserting after the item relating to chapter 50 the following new item':

50A. Genocide.............................................................................1091.

### Gold Fringed Flag

The flags displayed in State courts and courts of the United States have gold or yellow fringes. That is your warning that you are entering into foreign enclave, the same as if you are stepping into a foreign embassy and you will be under the jurisdiction of that flag. The flag with the gold or yellow fringe has no constitution, no laws, and no rules of court, and is not recognized by any nation of the earth, and is foreign to you and the United States of America.

#### The United States Military Flag with the Gold Fringe

Martial Law Flag "Pursuant to 4 U.S.C. chapter 1, Sections 1, 2, & 3; Executive Order 10834, August 21, 1959: 24 F.R. 6865, a military flag is a flag that resembles the regular flag of the United States, except that it has a yellow fringe border on three sides. The President of the United States designates this deviation from the regular flag, by executive order, and in his capacity as Commander in Chief of the military. The placing of a fringe on the national flag, the dimensions of the flag and the arrangement of the stars in the union are matters of detail not controlled by statute, but are within the discretion of the President as Commander in Chief of the Army and Navy." 34 Ops. Atty. Gen 83.

President, Dwight David Eisenhower, by Executive Order No. 10834, signed on August 21, 1959 and printed in the Federal Register at 24 F.R. 6865, stated that military and United

States of America flag are the same except the military flag has yellow fringe border on three sides.

## The Law of the Flag

The Law of the Flag, an International Law, which is recognized by every nation of the planet, is defined as: "a rule that a vessel is a part of the territory of the nation whose flag she flies. The term is used to designate the rights under which a ship owner, who sends his vessel into a foreign port, gives notice by his flag to all who enter into contract with the ship master that he intends the Law of that Flag to regulate those contracts, and that they must either submit to its operation or not contract with him or his agent. Ref:  Ruhstrat v. People, 57 N.E. 41

By the doctrine of "four cornering" the flag establishes the law of the country that it represents.  For example, the embassies of foreign countries, in Washington D.C. are "four cornered" by walls or fencing, creating an "enclave." Within the boundaries of the "enclave" of the foreign embassy, the flag of that foreign country establishes the Jurisdiction and law of that foreign country, which will be enforced by the Law of the Flag and International Treaty.  If you enter an embassy, you will be subject to the laws of that flag, enforceable by the "master of the ship." (Captain), by the Law of the Flag.

When you enter a courtroom displaying a gold or yellow fringed flag, you have just entered into a foreign country, and you better have your passport with you, because you may not be coming back to the land of the free for a long time.  The judge sitting under a gold or yellow fringe flag becomes the "captain" or "master" of that ship or enclave and he has absolute power to make the rules as he goes. The gold or yellow fringe flag is your warning that you are leaving your constitutionally secured right on the floor outside the door to that courtroom.

This is exactly why so many judges are appointed, and not just elected by the people. The Federal judges are appointed by the President, the national military Commander in Chief. The State judges are appointed by the Governors, the state military commanders. The judges are appointed because the courts are military courts and civilians do not "elect" military officers. Under martial law, you are presumed guilty until proven innocent.

The gold fringed flag only stands inside military courts that sit in summary court martial proceedings against civilians and such courts are governed in part by local rules, but more especially by "The Manual of Courts Martial", U.S. 1994 ED., at Art 99, (c)(1)(b). pg. IV-34, PIN 030567-0000, U.S. Government Printing Office, Washington D.C. The details of the crimes that civilians can commit, which are classed as "Acts of War", cover 125 pages in the Manual of Courts Martial.

Under Article IV, section 3, of the Constitution for the United States of America, no new State shall be formed or erected within the jurisdiction of any other State. Why have the judges of the State and Federal courts been allowed to erect foreign enclaves within our public courthouses under a foreign flag with the yellow fringe upon the soil of your state?

We just thought you would like to know, so that the next time you see this yellow fringed flag you will know what you are looking at and what it really means.

**Reid vs. Covert**

At the beginning we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. The United States is entirely (354 US 1, 6) a creature of the Constitution. Its power and authority have no other source. It can only act in

accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land. This is not a novel concept. To the contrary, it is as old as government. It was recognized long before Paul successfully invoked his rights as a Roman citizen to be tried in strict accordance with Roman law. And many centuries later an English historian wrote:

The rights and liberties which citizens of our country enjoy are not protected by custom and tradition alone; they have been jealously preserved from the encroachments (354 U.S. 1, 7) of Government by express provisions of our written Constitution.

Among those provisions, Article III Section 2 sub section 2, and the Fifth and Sixth Amendments are directly relevant to these cases. Article III Section 2 sub section 2, lays down the rule that:

"The trial of all crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, The trial shall be at such Place or Places as the Congress may by Law have directed."

In No. 701, Reid v. Covert, the judgment of the District Court directing that Mrs. Covert be release from custody is affirmed.

Since all were reversed and remanded all cases using admiralty will be released. Therefore all other cases are res judicata.

9

## Reid vs. Covert Commentary

Admiralty Jurisdiction cannot be used on anyone within the bounds and jurisdiction of the United States of America.

"The United States is entirely a creature of the Federal Constitution, its power and authority has no other source and it can only act in accordance with all the limitations imposed by the Constitution." Reid vs. Covert, 354 U.S. 1 (1957), 1 7-.Ed. 2i-Ib. 1148.

"The Federal Constitution has supremacy over a treaty and executive agreement." Reid vs. Covert, 354 U.S. 1 Supra.

"The rights and limits of the citizens of the United States are not protected by custom and tradition alone; they are preserved from the encroachments of government by express (enumerated) provisions of the Federal Constitution." Reid vs. Covert, 354 U.S. I Supra.

"The prohibitions of the Federal Constitution are designed to apply to all branches of the national government and cannot be nullified by the executive or by the executive and the senate combined." Reid vs. Covert, 354 U.S. 1 Supra.

"In effect such construction would permit amendment of the instrument in a manner not sanctioned by Article V." Reid vs. Covert, 354 U.S. 1 (1957).


## Judge Yourselves (Common Law)

Luke 11:46 And he said, Woe unto you also, ye lawyers! For ye lade men with burdens grievous to be borne, and ye yourselves touch not the burdens with one of your fingers.

Luke 11:47 Woe unto you! For ye build the sepulchers of the prophets, and your fathers killed them.

10

Luke 11:48 Truly ye bear witness that ye allow the deeds of your fathers: for they indeed killed them, and ye build their sepulchers.

Luke 11:49 Therefore also said the wisdom of God, I will send them prophets and apostles, and some of them they shall slay and persecute:

Luke 11:50 that the blood of all the prophets, which was shed from the foundation of the world, may be required of this generation;

Luke 11:51 From the blood of Abel unto the blood of Zacharias which perished between the altar and the temple: verily I say unto you, It shall be required of this generation.

Luke 11:52 Woe unto you, lawyers! For ye have taken away the key of knowledge: ye entered not in yourselves, and them that were entering in ye hindered.

God's Order to Us

1 Cor. 6:1 Dare any of you, having a matter against another, go to law before the unjust, and not before the saints?

1 Cor. 6:2 The saints shall judge the world? And if the world shall be judged by you, are ye unworthy to judge the smallest matters?

1 Cor. 6:3 Know ye not that we shall judge angels? How much more things that pertains to this life?

1 Cor. 6:4 If then ye have judgments of things pertaining to this life, set them to judge who are least esteemed in the church.

1 Cor. 6:51 I speak to your shame. Is it so, that there is not a wise man among you? No, not one that shall be able to judge between his brethren?

1 Cor. 6:6 But brother Goethe to law with brother, and that before the unbelievers.

11

2 Peter 2:3 And through covetousness shall they with feigned words make merchandise of you: whose judgment now of a long time lingered not, and their damnation slumbered not.

2 Peter 2:4 For if God spared not the angels that sinned, but cast them down to hell, and delivered them into chains of darkness, to be reserved unto judgment.

All matters herein were tried in the Our One Supreme Court of Common Law pursuant to Article IX of the Bill of Rights reserved for We the People (Sovereigns under God). This is as the United States Supreme Court stated in the Clan of Red Feather and Bulltail vs. Great Northern Railroad U.S. 2001 not within the subject matter jurisdiction of an Article III court; therefore: Our One Supreme Common Law Court of We The People still reigns. The judgments of our common Law Court must be upheld by all statutory courts.


### Proper Jurisdiction

A bank, when operating as a Federal Home Loan Bank, Farm Credit Bank, or otherwise has no independent right to foreclosure against mortgages, credit card debt, or anything else. In all cases where a financial institution is a Federal Reserve Member, insured by the Federal Deposit Insurance Corporation, or another Federal account insurance fund, etc., the principal of Interest is the United States all "credit" is "hypothecated" on credit of the United States. In order for there to be litigation to collect a debt, (a) the Director of the General Accounting Office must make a liability determination, and (b) the Attorney General must initiate, authorize and/or contract civil prosecution. The action must be prosecuted in a lawful court of the United States. State courts do not have subject matter jurisdiction over Federal debt collection actions.

12

There are a few essentials relating to banking and credit that must be understood in order to come to terms with how to successfully discharge bank-originated debt, and why you probably weren't eligible to borrow from a financial institution operating under Federal charter to begin with. The first matter is the nature of "credit" extended by Federally chartered and/or Federal Reserve or FDIC-member financial institutions.  It is important to grasp what "credit" is, as defined at 15 U.S.C. Section 1602(e): "Credit" is a grant of authority to defer payment of debt, or create debt then defer payment.

Debt is never paid.  The fraudulent system depends on a constant creation and exchange of "credit." Virtually all "credit" is based on an obligation of the United States. In one way or another, we pass "credit" hand-to-hand rather than receiving lawful payment for goods and services, particularly our labor.  It should be obvious where the colorable grant of authority to defer payment of debt or create debt then defer payment originates.

For purposes of the Consumer Protection Act, the "creditor" is defined as the financial institution which provides credit, and the merchant who provides goods and or services. However, that definition is limited to the Consumer Protection Act itself it does not have general application.  Where there is a "credit" transaction under auspices of Federal grant of authority, the financial institution is in all cases operating as a "fiscal agent" of the United States (31 U.S.C. Sections 202 & 203), and in most if not all cases as "mixed-ownership" (hybrid) United States corporation (31 U.S.C. Section 9101). The United States is always principal of interest the "debt" is ultimately an obligation to the United States is and the United States has the only right of action to recover it. The financial institution that originates the "credit" merely services the debt; it is not the principal of interest.

13

The financial institution, whether a national bank, credit union, or whatever, is organized as an "association" to provide basic financial services for qualified association members. These entities deal exclusively in "public money", public money is hypothecated "credit of the United States." Therefore, only people who are authorized by law to receive and use "public money" are qualified to be association members. Those authorized by law to receive and use "public money" are officers and employees of the United States, and Indian tribes recognized by United States Government. See limiting provision at 31 CRF Section 202(a), and FDIC Insurance solely of "public money" accounts at 12 U.S.C. Section 1821 (a)(2)(A).

This is where the Social Security number comes in –the Social Security number creates a presumption that whoever applies for credit is one of those entitled to custody and use of public money. Under Federal law, the Social Security System is exclusively territorial, and Federal employees may participate. Federal territory now includes the District of Columbia and insular possessions such as Puerto Rico. (See definitions of "State", United States", and" citizen" at 26 U.S.C. Section 3121 (e) and attending regulations). However, that in and of itself isn't sufficient to sustain most foreclosures, etc. as the financial institution has no right of action to foreclose consumer or other "credit" obligations.

A national banking association may sue and be sued in states courts, but only so far as basic organizational matters are concerned. Under organization charters, these institutions may provide only basic services such as checking accounts for qualified association members. They may own property necessary to conduct business. To go beyond that, they must apply to become, and be licensed as Federal Tax & Loan Depositaries, and Treasury Depositaries (31 CRF Sections 202 & 203). Only then can they apply to become Federal Home Loan Banks,

14

Farm Credit Banks, etc. When they function in these capacities, they operate in Federal agency capacity, and the United States is all times principal of interest.

They are subject to all Federal statutory and regulatory mandates and prohibitions, including mandates of Privacy Acts and Paperwork Reduction Act disclosure. If and when there is a "credit" default, there must be administrative collection process in accordance with HUD and other applicable regulations. The Secretary of HUD is responsible for appointing an agent in any give district, and where defaults are concerned; he has responsibility for pursuing administrative remedies. Ultimately, however, there must be a determination of liability by the Direct of General Accounting Office (31 U.S.C. Sections 3526 & 3701; 5 U.S.C. Section 55121) when and if the obligation is contested before any "debt" can be foreclosed.

The Attorney General, in his capacity as Solicitor of the Treasure, must then initiate litigation for debt recovery. The Attorney General may do this directly, authorize the United States Attorney for the district to foreclose or contract private attorneys. Process for Federal debt collection must be initiated in a court of the United States as defined at 28 U.S.C. Section 1610. Procedure is prescribed in Chapter 176 of Title 28 (28 U.S.C. Sections 2001 et seq.).

Where financial institutions have initiated foreclosures and the like in state courts, the case should be vacated and dismissed with prejudice for lack of subject matter jurisdiction. Subject matter jurisdiction can be raised at any time-there is no statute of limitations.

United States of America Constitution Amendment VII- In suits at common-law where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of the United States, than according to the rule of common law.

15

Bill of rights, Article IX- In suites at common law where the value in controversy shall exceed twenty dollars, the right trial by Jury shall be preserved; and no fact tried by a jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of the United States, than according to the rules of Common Law.

Discovery when discovery was demanded as to the existence of a Promissory Note the judge refused discovery and accounting by a competent person of the bank.  This is to say that the accuser is correct and proof its correctness is incontrovertible, thereby guilty until proven innocent.

Plaintiffs' pleadings set the jurisdiction of this cause in the jurisdiction of the American flag, Title 4 U.S.C. Sec 1, of the United States of America. When Plaintiffs captured Miami-Dade County, State of Florida, now is within the jurisdiction of a Federal Court, as all courts are United States Federal Courts because of the United States Federal Oath or affirmation and the Title 4 U.S.C.  Section I- American flag.

### Brief on Promissory Notes

The need to have a promissory note produced whenever demanded by either party is expounded in the summery of a partial list of cases used below.  These points of law have been in existence since paper (recorded) contracts replace the use of a club.  The reader must bear in mind that our nation was created on the principles of inalienable rights as expounded in our beginning; therefore, The Holy Bible.

See In Re:  SMS FINANCIAL LLC. v. ABCO HOMES. Inc. No. 98-50117 February 18, 1999 (5th Circuit Court of Appeals) and the Courts have held further that not part payments should

16

be made on the bond or note unless the person to whom payment is made is able to produce the bond or note and the part payments are endorsed thereon. "We find that a bank's credit card account is analogous to a promissory note..." Karen Smith Bird, Appellant v. First Deposit National Bank, Appellee, 1999 Tex. App. Lexis 3804, *994 S.W. 2nd 280.

Without proof of damages, there are no damages: i.e. American Red Cross v. Community Blood Center of the Ozarks. 257 F.3d 859 (8th Cir. 07/25/2001. If no one is able to produce the original "instrument", there is no competent evidence before the court that any party is the holder of the alleged note or the true holder in due course: in the day of computer technology and the sophisticated means by which a document can be put together to make the copies say whatever the bank wants to have them say with (party)'s signature from another source attached, in fact, is no proof of anything and there is still no proof without competent evidence that (bank) is still holder of the alleged note or the true holder in due course to make a claim, can prove the existence of the alleged note in question and can show what the original contract actually was including inspection of forgery and/or unauthorized makings/changes/alleges, can prove that the party sued signed the alleged note, and can show an actual debt with original account ledgers and or records. Federal Circuit Courts have ruled that the only way to prove the perfection of any security is by actual possession of the security. See Matter of Staff Mortgage & Invest Corp. 550 F. 2d 1228 (9th Cir. 1977).

The Hawaii Supreme Court stated that since the "ledger had not been attached to the affidavit, any information there from was inadmissible and should not have been considered by the circuit court" and that the "(a) affiant's testimony as to what was in the ledger was

17

inadmissible hearsay" "Pacific Concrete Federal Credit Union v. Kauanoe, 82 Haw. 334, 614 P.2d 936 (1980).

### Cases on Promissory Notes

McKay v CAPITAL RESOURCES COMPANY. LTD. 96-200 SW .2d 1977 where appellee apparently never possessed appellants' original note as provided in Ark Code Ann. 4-3-309(a) (i) Repl. 1991). But was required, even if it had, to have proven all three factors specified in 4-3-309(a) and did not do so, appellee could not enforce the original note's terms by the use of a copy; even if all three requirements in 4-3-309(a) had been proven, the trial court was still obligated to ensure that appellee provided adequate protection to the appellants from any future claim, and this, Too, was not done. First, as previously discussed, we mention the unfairness in these circumstances that, if a duplicate was allowed in place the original note, the McKay could later be subjected to double liability if the actual holder of the note appeared. Next, we add that the Rules of Evidence are rules of the court involving legal proceedings, while the UCC is composed of statutes of law that established the rights and liabilities of persons. Again, as previously discussed, Capital Resources, as an assignee of the McKay' note, could not sue on the underlying debt the McKay owed to Landmark Savings. For Capital Resources to have prevailed in enforcing the McKay' note, it was required either to produce the original or satisfy the requirements for a lost negotiable instrument under 4-3-309 (a) and (b). Because Capital failed to do either, we must reverse and remand.

Mortgage Securities Inc. v. Hartley LORD. No. 4D02-4051, July 23, 2003. Mortgagee by assignment brought foreclosure action. The Circuit Court, 15th Judicial Circuit, Palm Beach County, Edward Fine and John Wessel, JJ. entered summary Judgment for mortgagor. Mortgagee

18

appealed.  The District Court of Appeal. Stone, J. Held that mortgagee could not maintain cause of action to enforce missing promissory Note or foreclose mortgage, in absence of proof that mortgagee or assignor ever had Possession of note.

LORRAINE C. TILLMAN v VIRGINIA SAVAGE SIMITH (07/25/85) The purpose of the section is well expressed by commentator Car W. Ehrhardt as Follows: The drafters of the Code excluded from the general rule of admissibility of Duplicates these documents because the possessor of the documents is the owner of the obligation that they represent and the party who may bring a cause of action based on the document Therefore, the person who possesses the duplicate may not possess the cause of action. For example, if A makes a Xerox copy of a promissory note and subsequently negotiates the original to B, under section 90.953(1), A, the transferor, is not able to sue on the Xerox copy of the promissory note. (22) Ehrhardt, Florida Evidence & 953.1 (2d ed. 1984.  See Also Lowery v States, 402 So.2d 1287 (Fla. 5th DCA 1981). To fail under section 90.953(1), the agreement would have not only to evidence a right to the payment of money, but be "of a type that is transferred by delivery in the ordinary course of business with any necessary endorsement or assignment" (emphasis added).

Mason v. Rubin, 727 So.2d 283, 37 UCC Rep. Serv. 2d 1087 (Fla.App.Dist 4) 02/10/1999 Establishing a lost negotiable instrument is governed by different statute, Section 673.3091, Florida Statutes (1993).  The latter statute contains more stringent requirements than the former, and the trial court correctly concluded that the husband did not satisfy section 673.3091.

Enforcement of lost, destroyed, or stolen instrument RSMo 400.3-309. (a) A person not in possession of an instrument is entitled to enforce the instrument if (i) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (ii) the loss of

19

possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process. (This refers to statutory transactions only, not to common law transactions over $500.00)

Figueredo v. Bank Espirito Santo No. 88-1808. Jan. 31. 1989. Fl Third District. The plaintiff failed to produce for admission into evidence the original copy of a negotiable promissory instrument as is expressly required by section 90.953(1), Florida Statutes (1987). For this reason, the final judgment of foreclosure is vacated with directions for the trial court to receive the original promissory note in evidence.

SMS Financial LLC v. Abco Homes, Inc. No. 98-50117 February 18, 1999 (167 F. 3d. 235; 5th Circuit Court of Appeals.) Where the complaining part cannot prove the existence of the note, then there is no note. To recover on a promissory note, the plaintiff must prove: (1) the existence of the note in question; (2) that the party sued signed the note; (3) that the plaintiff is the owner or holder of the note; and (4) that certain balance is due and owing on the note. Since no one is able to produce the "instrument" there is no competent evidence before the Court that any party is the holder of the alleged note or the true holder in due course. New Jersey common law dictates that the plaintiff proves the existence of the alleged note in question, proven that the party sued signed the alleged note, proven that the plaintiff is the owner and holder of the alleged note. Federal Circuit Courts have ruled that the only way to prove the perfection of any security is by actual possession of the security. See Matter of Staff Mortgage & Invest Corp., 550 F. 2d 1228 (9th Cir 1977). "Under the Uniform Commercial Code, the only notice sufficient to inform all

20

interested parties  that a security interest in instruments has been perfected is actual possession by the secured party, his agent or bailee. "Bankruptcy Courts have followed the Uniform Commercial Code, in Re Investors & Lenders, Ltd. 165 B.R. 389 (Bkrtcy.D.N.J.1994). Unequivocally the Court's rule is that in order to prove the "instrument", possession is mandatory.  In addition to the note, another element of proof is necessary—an accounting that is signed and dated by the person responsible for title account.  Claim of damages, to be admissible as evidence, must incorporate records such as a general ledger and accounting of an alleged unpaid promissory note, the person responsible for preparing and maintaining the account general ledger must provide a complete accounting which must be sworn to and dated by the person who maintained the ledger. See Pacific Concrete F.G.U. V. Kauanoe: 62 Haw. 334.614 P.2 d 936 (1980) GE Capital Hawaii, Inc. v Yonenaka 25 P.3d 807, 96 Hawaii 32, (Hawaii App 2001). Fooks v Norwich Housing Authority 28 Conn. L. Rptr., 371, (Conn. Super.2000), and Town of Brookfield v. Candlewood Shores Estates, Inc. '513 A.2d 1218, 201 Conn. 1 1986).

See & 90.953, West's Fla. Stat Annotation (1979) (Sponsor's Note); C. Ehrhardt, Florida Evidence & 953-1. At 605 & n.5; Lowery v State, 402 So. 2d 1287, 1288-89 (Fla. 5th DCA 1981).

90.953(1) Florida Statutes is misplaced.  The purpose of that subsection is to require production of the original where there is an action on a negotiable instrument in such instance, the original instrument must be brought forward both to demonstrate the right to payment and to preclude the possibility that the instrument has already been negotiated.

State Street sought to establish the promissory note and mortgage under Section 71.011, Florida Statutes.  State Street alleged that Hartley executed the note and Mortgage and that, after

21

multiple assignments, the documents were assigned to State Street by EMC Mortgage Corporation. Although State Street alleged in its' pleading that the original documents were received by it, the record established that State Street never had possession of the original note and, further, that its assignor, EMC, never had possession of the note and, thus, was not able to transfer the original note to State Street. (Emphasis added mine)

The trial court correctly concluded that as State Street never had actual or Constructive possession of the promissory note, State Street could not, as matter of law, maintain a cause of action to enforce the note or foreclose the mortgage. The right to enforce the lost instrument was not property assigned where neither State Street nor its predecessor in interest possessed the note and did not otherwise satisfy the requirements of section 673.3091, Florida Statutes, at the time of the assignment. See Slizk vs. Smilack, 825 So. 2d 428.430 (Fla. 4th DCA 2002).

In Mason vs. Rubin, 727 Sp/ 2d 283 (Fla. 4th DCA 1999), the appellant brought a foreclosure action on a second mortgage, the trial court denied the foreclosure, and this court affirmed on the basis that the appellant had failed to establish the lost note under section 673.3091. Likewise, here, where State Street failed to comply with section 673.3091, the trial court correctly entered summary judgment denying its foreclosure claim. In contrast, here, the undisputed evidence was that EMC, the assignor never had possession of the notes and, thus, could not enforce the note under section 673.3091 governing lost notes. Because EMC could not enforce the lost note under section 673.3091, it had no power of enforcement which it could assign to State Street.

Raymond E. Shores and Mercene G. Shores vs. First Florida Resource Corporation (10/11/72) Appellants are entitled to assurance that they will not later be sued by a holder of

these instruments…If there are parties having any claim to these instruments they should be brought into the action and the matter determined.  The instruments should then be reestablished, recorded and appropriate judgment entered.

## Florida Statutes on Common Law Trusts

### Common Law in force in Florida, Florida Statutes Chapter 2.01

Common law and certain statutes declared in force. The common and statute laws of England which are of a general and not a local nature, with the exception hereinafter mentioned, down to the 4th day of July, 1776, are declared to be of force in this state; provided, the said statutes and common law be not inconsistent with the Constitution and laws of the united States and the acts of the legislature of this state.

### Common Law Declaration of Trust, Florida Statutes Chapter 609.01

Common law declaration of trust. Two or more persons, whether residents of this state or not, may organize and associate themselves together for the purpose of transacting business in this state under what is commonly designated or known as a "declaration of trust"

## A Common Law Trust Organization

### Legal Cities of Court Cases

One of the common questions arising in the formation of Common-Law trusts surrounds its legality. The enclosed legal cities are some important cases to support the common-law, contractual company, pure trust entity.

23

Article 1, Section 10 of the United States Constitution- "No state shall pass any law impairing the obligation of contracts".

## Confirming the Trust Contract

A.   Certificate holders are devoid of legal rights, have no officers, are and must remain forever mute as to the selection, approval or disapproval of the trustees and their methods of conduct of business affairs would make the trustee absolute owner. Bourchard v. First People's trust, 253 Mas 351, 148 NE 895.

B.   Right to Contract Schumman-Heink v. Folsom, 159 NE 250 (1927)

C.   United States Supreme Court has long held and recognized that freedom to make contracts and have them enforced by the courts is a part of the bundle of rights protected by the "due process: clauses of both the Fifth and Fourteenth Amendments. Paterson v. Bank Eudora (1903) 190 US 169, 47 L Ed 1002, 23 S Ct 821 Muller v. Oregon, 208 US 412, 52 L Ed 551, 38 S Ct 324 1908 v. U.S. 157 US 160, 39 L Ed 657, 15 S Ct 586 (1895)

D.   The trust contract is established by private parties, for personal purposes, is not registered with the state corporation commissioner to comply with statues relating to incorporating and does not invalidate the trust organization.

E.   Certificate holders of a Trust Contract enjoy an even greater immunity from personal liability than is accorded to stockholders of corporations. Goldwater v. Oltman, 210 Cal 408, 292 P624, 71 ALR 871

F.   One of the main objectives of a trust contract is to obtain most of the advantages of corporations, but with freedom from the burdens, restrictions, and regulations generally imposed upon them. Ashworth v. Hagen Estates 165 Va 151, 181 SE 381

24

G.    The United States Supreme Court has acknowledged the Trust contract as a "pure or true" trust, citing the Hecht case in the Navarro v. Lee. Hecht v. Malley 265 US 144 (1924) Navarro v. Lee 446 US 458 (1980)

H.    Business trusts are found in Corpus Juris Secundum and American Jurisprudence, 2d.

I.    Business trusts recognized under the term "common law trust" 88 American Law Reports 3d 704, citing Schumann-Heink v. Folsom 328 III 321, 159 NE 250, ALR 485 (1927)

J.    A trust is one of several juridical devices whereby one person is enabled to deal with property for one benefit of another person. Restatement of the Law of Trusts, 2d Introduction Note, Pa.1

K.    Any law or procedure materially affecting contract rights necessarily impairs the obligation of the contract upon which right is founded and is, therefore, violative of the United States Constitution. Smith v. Morse 2 CA 524.

L.    The creation of a Pure Trust is not subject to legislative control. The United States Supreme Court holds that trust relationship comes under the realm of equity, based upon common law, and is not subject to legislative restrictions as are corporations and other organizations created by legislative authority. Eliot v. Freeman 220 US 178.

M.    The creator of a Pure Trust may mold and give it in any shape he chooses, and he chooses, and he or the trustees may provide for the appointment of a successor or successors to the trustee or trustees, upon such terms as he may choose to impose. Shaw v. Pine 12 Allen (Mass) 293; also in Harwood vs. Tracy, 118 Mo. 631, 24 SW 214.

N.    The court will support the trustees in carrying out the terms of their Trust contract and agreement. Clews v. Jamison, 182 US 461, 21 S. Ct. 845

25

O.  Trust property cannot be held under attachment nor sold upon execution, for the trustees' personal debts. Personal Liability of a trustee cannot be enforced against the trust property. Mayo v. Mortiz, 24 N.E 1083 (1890)

P.  If the trustee owned personally any amounts of beneficial interest, these Certificate Units can be attached. Hussev. Arnold 70 N.E. 87 (1904)

### Contract Trust Recognized by IRS

A.  Internal Revenue Regulations acknowledgement of contract Trust Organization. IRS Regulations 301, 7701 4 (b) Berry v. McCourt 204 NE 2d 235, 240

B.  An "exchange" is a reciprocal transfer of property as distinguished from the transfer of property for a money or consideration only. TR 118, S. 39.112 (a) 1(e)

C.  The owner of Beneficial Certificates is not an owner as a stockholder is an owner; the Certificate Holders have no ownership whatever in property held by the Contract Trust, nor do they have any voice or control over the Trustees. Becker v. St. Louis Union Trust Co. 296 US 48, 50; 80L ED 35:56 S CT 78.

D.  "The Internal Revenue Code classifies a Trust as an 'individual' for tax purposes. Trusts are included with persons and "individuals" in Section 1 which lists entities which are subject to tax. Also section 3(b) (2) refers to Trusts as individuals. Also the tax forms for trusts clearly illustrate they are not to be exchanged for assets, and thus there is no taxable event because of this exchange, as determined by the U.S Supreme Court." Burnett v Logan 283 U.S. 404). (Stern v C.I.R. 747 F. 2d 555 (1984)

## No Gift or Estate Taxes

A.    Certificates have no ascertainable "Fair Market Value", and have minimal value to someone else.  Bad bargains do not result in taxable gifts.  Contract Trust in a genuine business transaction. Estate of Anderson V. Commissioner of Internal Revenue. 8 Tax Court 706.721

B.    Rationale of federal estate tax is not a levy on property of the state but its transfer at death. Second National Bank of New haven v U.S. 422 F 2d 49 (1970)

## No Gifts or Estate Taxes

A.    If a bona fide transfer, sale or exchange is made at arm's length in the ordinary course of business, the transaction will be assumed to be for consideration and not gratuitous.  A consideration that is not reducible to a value in money or money's worth, i.e. love and affection or promise or marriage, is to be wholly disregarded and considered totally gratuitous. Internal Revenue Service "Federal Estate and Gift Taxation Publication" #488

B.    The United States Circuit Court of Appeals for the First Circuit has long held that full and adequate consideration is met by issuance of trust certificate units in exchange for real and personal property invested in a "pure" trust organization. Carpententer v White, Cir. 80 F 2d 145

C.    The measure of the gain of an exchange is the difference between the (adjusted) cost basis of the property transferred and the fair market value of the property received. Internal Revenue Code 1001 (a), (b) Parrington v Attorney General LR. H.I. 100. 122.

D.    No "Equitable Construction of a tax statute. Code must be strictly construed. Gain (is) measured from fair market value of property received. U.S. V Merriam, 263 US 179 (1923) Commissioner v. Harrelson 282 US 55 (1930) Gould v Gould US 151

E.    The "fair market value" is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion buy or sell, and both having knowledge of all relevant facts. It may not be determined by a forced sales price, nor is it to be determined by the sale price of the item in a market by a forced that in which such item in a market other than that in which such item is most commonly sold to the public. Federal Estate and Gift taxation, Publication, No. 448  Davis v U.S. (1961) 287 F 2d 168, 82 S Ct. 805 affirmed in part and reversed in part on other grounds, 370 US 65, 82 S Ct 1190, 90, 8 L Ed 335, Rehearing denied 371 VS 854, 83 S. Ct 14, 15.F)

F.    IRC Section 1001 (b) requires that the capital gain be measured by "the fair market value" of the property received (emphasis added) by the taxpayer, not by the fair market value transferred by the taxpayer in exchange for the property received. To say that the fair market value of the property received is the same as the fair market value of the property given up not only ignores realities, but is the use of a formula which is radically different from the recognized formula approved by the courts for determining fair market value. Commissioner v. Marshman 279 F 2d 27, Cert. den. 364 US 918, 8 Ct 282, 286; 5 L Ed 2d 259. Maxfied v. U.S. 152 F 2d 593, Cert. den. 2 Cases 327 US 791, 66 S Ct 821.9

G.    This definition primarily benefits the Treasury in estate tax situations. However, IRS may not have one definition for "fair market value" at one time when it is beneficial, and a different one for another time when the benefit goes to the taxpayer. The IRS is obliged to

keep their conclusion that the fair market value of valuable beneficial units cannot be determined in any forum other that a voluntary sale.

H.    The IRS may not force a sale to determine price where the item displays an inherent yet unsettled value. They may also not force the beneficial units to be sold in a market other than that in which such certificates may commonly be sold to the public. In addition, when the Treasury says "public", they mean at retail rather than wholesale. The value of the above definition is evident in the point that the client may plan affairs around hard and fast rules not subject to change. Federal Estate and Gift Taxation, Publication No. 448, p. 39 Burnett v. Logan, 283 US 404, 51 S Ct. 75 LED 1143 (1931).

I.    Interests which terminate "on" or "before" death are not a proper subject of the Federal Estate Tax. Knowlton v. Moore, 178 US 41, 20 S Ct. 7471, 44 L Ed 969 (1900): YMCA V. Davis, 264 US 47 (1924), 44 S Ct 291, 68 LED 564: Goodman v. Grander, 243 F 2d 264 (1957): Babb v. US 349 F Supp 792 (1972).

J.    Because Code Sec. 64`1 does not provide a method for determining the basis of property transferred (into a trust), Code Sec. 2516 of the gift tax provisions control. Under Code Sec.2516, the distribution of (property) was deemed to be a transfer for full and adequate consideration --. Accordingly, the trust's basis in the (property) was its fair market value on the date of transfer (St. Joseph Bank and Trust Co., Ca 7, 832 USTC 9586.) – (907 CCH – Standard Federal Tax Reports 46, 191.)

## Contract Trust as a Legal Entity

A.    The Contract Trust owns the property and is a distinct legal entity. Beneficial Certificate Holders are not treated as co-owners of trust property. National City Finance v. Lewis

(Cal App) 9P 2d 316 (Rehearing denied) 4P2d 163: Beilin v. Krenn & Dato 350 111284, 183 NE 330: Hemphil v. Orloff 238 Mich 508, 213 NW 867, 58 ALR 507, aid 277 US 537. 72 L Ed 978. 48 Ct. 577, Annotation 156 Alr 32, Goldwater v. Oltman, 210 Cal 408: 292 P 624.

B.   The Contract Trust does not escape the necessity of having no economic effect other than the creation of income tax losses, cannot be recognized for tax purposes. Thompson v. Commissioner. 631 F 2d 642. 646 (1980) Cert. Denied 452 US 961 (1981) Edwards v. Commissioner .415 F 2d 578, 582 Lewis and Taylor, Inc. v. Commissioner, 447 F 2d 1074 (1971).

C.   The fact that transactions of business are so arranged that tax consequences are highly favorable (or altogether avoid taxes) affords no license to the government to recast it into a mold or less advantage. Gyro Engineering. Inc. F 2d 578 Peter Pan Seafoods, Inc. v US 417 F 2d 670.

D.   "It (Pure Trust) is established by legal precedent that pure trusts are lawful, Valid Business Organizations." Baker v Stern 58 A.L.R. 462.

E.   "Trust or trust estate is a legal entity for most all purposes as are common law trust." Burnett vs. Smith 240 S.W. 1007 (1922).

### Legal and Equitable Title Held by Contract Trust

A.   Legal and equitable title by contract trust. Hecht v. Malley US 144.68 L Ed 949, 44 Ct. 462 Williams v. Milton 215 MASS 2. 102 NE 355 Goldwater v. Oltman, 210 CA 148. 292 P624. 71 ALR 871 Schumann-Heink v. Folsom 328 111321. 159 NE 250, 58 ALR 485.

30

B.    When legal and equitable title, possession and control of property are legally and irrevocably passed from the Trustor (contracting investor) to himself as Trustee in legal contemplation. it is as though the trustee receiving the conveyance is another person. Com. of Internal Revenue v. St Louis Trust Co., 296 US 48, 50 (1935).

C.    Property invested in the Contract Trust Organization must be fixed and irrevocable. Thus the Trustor (contracting investor) may legally be recognized as a different person even when de facto he/she may be the same human being. Trusteeship is a position created by parties at arm's length which when established is an office to be occupied by any qualified person. Becker, Collector Internal Revenue v. St Louis Union Trust Co. 296 Us 48, 50. 50: 80 L ED 35 56 S Ct 78.

D.    Genuine contractual obligations control the substance. Estate of Hilt N. Goodwyn, T.C. Memo 1976-238

E.    Trustees of the Contractual Trust have the exclusive power to interpret or construe the intent and direction of the Trust Indenture. Cohen v. US Trust Securities Corporation. 40 NE 2d 282.

F.    Statutes may authorize limited liability of partnerships and corporations, but those statutes do not by implication prohibit the creation of Contract Trust to enjoy similar immunity by virtue of Common Law. Goldwater v. Oltman, 292 P 624. 71 ALR 871 Annotation

G.    In tax context. "Associated" relates to a joint action and interest of the stock holders and their directors. Contract Trust Trustees and Beneficiaries are not associated in a joint action. Elm Street Realty Trust, 76 TC No 68 (1981): Morrissey v. CIR, 296 US 34 (1935): Crocker v. Malley. 249 US 223 (1919); Internal Revenue Regulations 301.7701-1.

31

2(a) (2); Schumann Heink v. Folsom. 159 NE 250, annotation 58 ALR 485; Hecht v. Malley, 265 US 144.

H.    IRS Regulations state the term "Person" includes an "Unincorporated Organization or Group". Internal Revenue Regulations 301.7701-1 (a) Internal Revenue Regulation Ruling 73-254

I.    It is whether the entities were taxable as association with the corporation rates applied, or as trusts (with the conduit method applied). Commissioner v. Brouillard, 70 F 2d 154, 157, Cert denied 293 US 574 No., 152

J.    The United States Supreme Court Articulated what has become recognized as the standard for determining whether an entity will be taxed as a corporation or as a trust by saying that it's the nature of the entity's dominant functions and attributes which determines whether it is an association for tax purposes.

K.    The system and course of procedure approximates much more closely that of an ordinary partnership among personal friends reposing "full confidence" (Pure trust a Contract Trust) in each other. The resemblances predominate strongly in favor of trusts, not associations. Commissioner of Internal Revenue v. Brouillard Same v. Shepherd Syndicate, and Same v. Pryor & Lockhart Development Co., 70 F 2d 154 Cert. den. 293 US 574 No. 152 Hemphil v. Orloff, 277 US 537, 48 S Ct 277, 72 L Ed 978 cited Ibid.

<u>Foreign Conduit (Foreign Structure), Miscellaneous</u>

A.    Foreign Trust (is a trust) the income of which, from sources without the United States which is not effectively connected with the conduct of a trade or business within the

32

United States, is not includable in gross income under subtitle A( Income Taxes). Internal Revenue Code Sec. 7701 (a) (31)

B.   Since 1967 the Internal Revenue Code has actually provided that a blanket exception from federal gift taxation is provided for all gifts made by nonresident alien of intangible property even though the situs or location of that intangible property is within the United States. IRC Sec. 2.501 (a) (2). All intangibles include stock bonds, funds, notes or other certificates of indebtedness (not Federal Reverse Notes "green backs" or US currency, or checks drawn on US banks – IRR Sec. 25.2511-3 (b) (4) (IV), bank accounts, or US government bonds, etc.)

Additional Legal Opinions

"Dignity of contract cannot be set aside because a tax benefits result either by design or accident." Edwards v. Commissioner, 416 F 2d 578, 582,10[th] Cir (1969)

"A Pure Trust is not illegal if formed for the express purpose of avoiding taxation." Weeks vs. Sibley, (D.C.) 269 F. 155

"U.S. taxpayers may also use tax havens for tax planning reasons. Some transactions conducted through tax havens have a beneficial tax for U.S Taxpayers that it completely within the letter of the U.S. tax laws." Federal Tax Guide Reports in official IRS agent's manual.

Each taxpayer in our country has the perfect right to do everything within his or her power to legally reduce his or her liability to the least legal limit that can be reached.

The government does not contend that the trusts were not valid legal entities, from the people who set up or from those who held certificate units. U.S. v. Brownlee

33

The validity and capacity of these contractual companies has been recognized in other "sister states" and would refer your attention, in this regard, to State v. Cosgrove, 210 P. 393(Supreme Court of Idaho, 1922) and Pacific American Realty Trust V. Lane Tot, 381 P.2d 123 (Supreme Court of Washington, 1963).

In the celebrated case of United States v. Dahlstrom, 713 F. 2d 1423 (C. A. 9, 1983) before the United States Court of Appeals for the Ninth Circuit. The opinion, decided August 24, 1983 ... dealt a death blow to I.R.S. hopes of utilizing misinformation schemes to terrorize average taxpayers with the spectra of criminal liability and deter them from engaging in creative tax planning.

A trust can be a separate, legal profit making, business entity. When trust income is accumulated or distributed at the sole discretion of the Fiduciary (the Board of Trustees), net income so held and accumulated is taxable to the trust. Only the income that is distributed to the beneficiaries is taxable to them. In one case, the I.R.S. claimed that the trust was as association taxable as a corporation, and thus, not so taxable. It also states that income earned by the trust in any given year, not distributed, as is the case with incorporated businesses. Buitar Family Trust Estate v. Commissioner 72 F 2d 544 (1934).

And, most important of all, the contractual companies are not trusts under the Code – for trusts, by their very definition, at common law, require a division or split of title(legal and equitable) between the trustees, serving on the corpus of the trust, and the beneficiaries.


**Trusts**

A trust is. "An obligation arising out of a confidence reposed in the trustee, or

34

person who has the legal title to property conveyed to him, that he will faithfully apply the property according to the  Confidence reposed: in other words, according to the wishes of the creator of the trust." Beers v. Lyon, 21 Conn. 604.

There are four essential elements of a valid trust of personal property: (1) A designated beneficiary; (2) a designated trustee, who must not be the beneficiary; (3) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (4) the actual delivery of the fund or other property, or of a legal assignment thereof to the trustee, with the intention of passing legal title thereto to him as trustee. Brown v. Spohr, 180 N. Y. 201.

A declaration of trust is not confined to any express form of words, but may be indicated by the character of the instrument. Kekewich Y. Manning 1 De G. M. & G. 176.

The one thing necessary to give validity to a declaration of trust-the indispensable thing--I take to be, that the donor, or grantor, or whatever he may be called, should have absolutely parted with that interest which had been his up to the time of the declaration, should have effectually changed his right in that respect, and put the property out of his power, at least in the way of interest. Bacon, Warrimer v. Rogers, L. R. 16 Eq. 340.

A man may transfer his property, without valuable consideration, in one of two ways: he may either do such acts as amount in law to a conveyance or assignment of the property, and thus completely divest himself of the legal ownership, in which case the person who by those acts acquires the property takes it beneficially or on trust, as the case may be; or the legal owner of the property may, by one or other of the modes recognized as amounting to a valid declaration of trust, constitute himself a trustee, and, without an actual

transfer of the legal title, may so deal with the property as to deprive himself of its beneficial ownership, and declare that he will hold it from that time forward on trust for the other person. Jessel. Richards v. Delbridge, L. R. 18 Eq. 11.

In all cases where a deed or other instrument of conveyance is absolute on its face, and the grantor or his assignee seeks to defeat its operation by showing that the deed, though absolute in form, was, in fact, executed upon certain express trusts, the grantee may invoke the protection of the statute of frauds by requiring proof of these alleged trusts to be made in writing. Allen v. Woodruff, 96 111. 11.

A trust will be implied, if the intention to create one "can be fairly collected from the instrument." It is of no controlling significance that the will does not in so many words declare the existence of a trust. Cardozo, In re Security Trust Co. of Rochester, 232 N. Y. 109.

The rules of law are presumed to be known by all men; and they must govern themselves accordingly. The ;law holds that the insertion of the word "trustee" after the name of a stockholder does indicate and give notice of a trust. No one is at liberty to disregard such notice and to abstain from inquiry, for the reason that a trust is frequently simulated or pretended when it really does not exist. The whole force of this offer of evidence is addressed to the question, whether the word "trust" alone! Has any significance and does amount to notice of the existence of a trust. But that has heretofore been decided, and is no longer an open question in this commonwealth. Foster, Shaw v. Spencer, 100 Mass. 382.

On principle, it seems to me impossible: for the moment both meet in the same

person, there is an end of the trust. He has the legal interest, and all the profits, by his best title. A man cannot be a trustee for himself. Mansfield, Goodright v. Wells, 2 Douglas 771.

The general rule is that in suits respecting trust property, brought either by or against the trustee, the cestuis que trusts as well as the trustees are necessary parties. To this rule there are several exceptions. One of them is that where the suit is brought by the trustee to recover the trust property or to reduce it to possession, and in no wise affects his relation with his cestuis que trust, it is unnecessary to make the latter parties. Swayne, Carey v. Brown, 92 U. S. 171.

It is very clear, upon principle of authority, that the estate in the hands of the trustee is bound in equity to discharge the legacies to the other cestuis que trust, before he or his assigns can claim any part of it, if the estate has been diminished by a violation of his duties as trustee. The equities of those to whom he is bound by his assumption of the trust are prior and superior to any which he can create in the trust fund by contract. Hoar, Belknap v. Belknap, 5 Allen 468.

A trust may be created which may be perfectly consistent with the law, and yet the law may have pointed out no mode of enforcement; still it would not interpose to prevent it, but would leave its execution to the voluntary action of the trustee. A person may convey his property upon what trust or condition he pleases so that it is not against the law. Ross v. Duncan, freeman Chancery (Miss.) 587.

The difficulty in which the courts of equity have been involved, with respect to dowers, I apprehend, originally arose thus: They had assumed as a principle in acting upon trusts, to follow the law; and according to this principle, they ought, in all cases where

37

rights attached on legal estates, to have attached the same rights upon trustees and consequently to have given dower of an equitable estate. It was found, however, that in the cases of dower this principle, if pursued to the utmost, would affect the titles of a large proportion of the estates in the country; for that parties had been acting on, the footing of dower, upon a contrary principle, and had supposed that by the creation of a trust the right of dower would be prevented from attaching. D'Arcy v. Blake, 2 Schoales v. Lefroy 387.

The actual possession of the trustee is but considered as that of the person beneficially entitled: indeed the estate of the trustee exists entirely for the benefit of the cestui que trust. Where the trust express, as in this case it is there can be no adverse possession between the trustee and the cestui que trust... A trust is not, as it was formerly held, a chose in action but a present interest, an estate in possession. Miller v. Bingham, 36 N. Car. 423.

The rule of public policy which subjects a debtor's property to the payment of his debts, does not subject the property of the donor to the debts of his beneficiary, and does not give the creditor a right to complain that, in the exercise of his absolute right of disposition, the donor has not seen fit to give the property to the creditor, but has left it out of his reach. Morton, Broadway National Bank v. Adams, 133 Mass. 170.

Must the trustee keep the cestui que trust advised as to what is being done with the it is no part of the duty of a trustee to assist his cestui que trust in mortgaging, or, as Lord Justice Lindley added "in squandering or anticipating his fortune," Low v. Bonveni (1891) 3 Ch. 82, but a trustee is bound to give his cestui que trust proper information as to the investment of the trust estate, and where the trust estate is invested on mortgage, it is

38

not sufficient for the trustee merely to say, "I have invested the trust money on a mortgage," but he must produce the mortgage deeds, so that the cestui que trust may thereby ascertain that the trustee's statement is correct, and that the trust estate is so invested. Chitty, In re Tillott. L. R. (1892) 1 Chancery 86.

The rule in general terms is that a trustee must in the investment of the trust fund act with good faith and sound discretion, and must, as laid down in Harvard College v. Amory, 9 Pick. 446, at page 461, "observe how men of prudence, discretion, and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested. Field, Dickinson, Appellant, 152 Mass. 184.

They are confined to giving and withholding assent, and the giving or withholding it "is not to be had in a meeting, but is to be given by them individually." "The sole right of the cestuis que trust is to have the property administered in their interest by the trustees, who are the masters, to receive income while the trust lasts, and their share of the corpus when the trust comes to an end. Holmes, Crocker v. Malley, 249 U. S. 223.

And the giving or withholding of consent by the cestuis que trust is not to be had in a meeting, but is to be given by them individually. As we have said, no meeting of the cestuis que trust for that or any other purpose is provided for in the trust indenture. The trustees of the Boston Property Trust have a right to sell the trust securities and reinvest the proceeds and also a limited power to borrow on the security of the trust property. The certificate holders or "cestuis que trustent" as they are called in the trust deed, have a common interest in precisely the same sense that the members of a class of life tenants

39

(among whom the income of a trust fund is to be distributed) have a common interest, but they are not socii, and it is the trustees, not the certificate holders, who are masters of the trust property. The sole right of the ces tuis que trustent is to have the property administered in their interest by the trustees, who are the masters, to receive income while the trust lasts, and their share of the corpus when the trust comes to an end. (It is plain that it is a trust and not a partnership.) Loring, Williams v. Milton, 215 Mass. 1.

## Memorandum of Law History, Force & Effect of the Land Patent

### Section I

### Allodial v Feudal Titles

In America today, there is a phenomenon occurring that has not been experience since the mid-1930. That phenomenon is the, increasingly, rising number of foreclosures, both in the rural sector and in the cities. The phenomenon is occurring because of the inability of the debtor to pay the creditor the necessary interested and principle on a rising debt load that is expanding across the country. As a defense, the land patent or fee simple title to the land and the Congressional intent that accompanies the patent is herby being present. In order to properly evaluate the patent in any given situation, it is necessary to understand what a patent is, why it was created, what existed before the patent, particularly in Common Law England. These questions must be answered in order to effectively understand the association between the government, the land and the people.

First, what existed before land patents since it is imperative to understand what the land patent is and why it was created, the best method is a study of the converse, or the Common Law

40

English land titles. This method thus allows us to fully understand what we are presently supposed to have by way o actual ownership of land.

In England, at least until the mid-1600' and arguably until William Blackstone's time in the mid-1700's property was exclusively owned by the King. In arbitrary governments; the title is held by and springs from supreme head be he, emperor, king, potentate; or by whatever name is known McConnell v. Wilcox, 1 Scam (iii). 344,367 (1873).

The king was the true and complete owner, giving him the authority to take and grant the land from the people in his kingdom that either lost or gained his favor. The authority to take the land may have required a justifiable reason, but such a reason could conceivable have been fabricate by the king living the disseised former holder of the land wondering what it was that had brought the king's wrath to bear upon him. At the same time the beneficiary of such a gift, while undoubtedly knowing the circumstance behind such a gift, may still not have know how the facts were discovered and not knowing how such facts occurred, may have been left to wonder if the same fate awaited him if ever he fell into disfavor with the king.

The king's gift were called fiefs, being the same as a feud, which is described as an estate in land held of a superior on condition of rendering him services. 2 Blackstone's Commentaries p. 105. It is also described as in inheritable right to the use and occupation of lands, held on condition of rendering services to the lord or proprietor, who himself retains the ownership in the land. Black's Law Dictionary, 4th Edition p. 748(1968). Thus the people had land they occupied, devised, inherited, alienated, or disposed of as they saw fit, so long as they remained in favor with the King. F.L. Ganshof, Feudalism P. 113 (1964). "This holding of lands under another was called a tenure, and was not limited to the relation of the first or paramount lord and

41

vassal, but extended to those to whom such vassal, within the rules of feudal law, may have parted out of his own feud to his own vassals, whereby he became the mesne lord between his vassals and his own or lord paramount. Those who held directly to the king were called his "tenants in......chief." 1. E. Washburn. Treatise on The American Law of real Property. Ch. II. Section 58, P 42, (6th Ed. 1902) In this manner, the lands which had been granted out to the barons principal lands were again subdivide, and granted by them to sub feudatories to be held of themselves. Ib. Section 65, p 44. The size of the gift of the land could vary from a few acres to thousands of acres depending on the power and prestige of the lord. See supra Ganshof at 113. The fiefs were built in the same manner as a pyramid with King, the true owner of the land, being at the top, and from the bottom up there existed a system of small to medium to large sized estates on which the persons directly beneath one state owned homage to the lord of that estate as well as to the King. Ib. At 114. At the lowest level of this pyramids through at least and 15th centuries existed to serfs or villains, the class of people that had no rights and were recognized as nothing more than real property. F. Goodwin, Treatise on the Law of Real Property, Ch. 11 p. 10 (1095). This system of hierarchical land holding requires an elaborate system of payment. These fiefs to the land are recompenses in any number of ways.

One of the more common types of fiefs, or the payment of a rent or obligation to perform rural labor upon the lord's lands known as socage, was the crops fief. Ib. At 8. Under this type of fief a certain portion of the grain harvested each year would immediately be turned over to the lord above particular fief even before the shares from the lower lords and the serfs of the fief would be distributed. A more interesting type of fief for purposes of his memorandum was the money fief. In most cases, the source of money was not specified, and the payment was simply

made from the fief holder's treasury, but the fief also consist of a fixed revenue to be paid from a definite source in annual payments in order for the tenant owner of the fief to be able to remain on the property . Gilsebert of Mons. Chronique, cc 69 and 115, pp 109, 175 (Ed Vanderkindere).

The title held by such tenant-owners over their land was described as a fee simple absolute. "Fee simple, Fee comment of the French field, i.e., praedium benefiarium, and legally signifieth inheritance as out author himself hereafter expoundeth it and simple is added, fro that it is descendible to his heirs generally, that is simply, without restraint to the heirs of his body, or the like, feodum est quod quis tenet ex quacunque cause sive sit tenementum sive redditus, etc. In Domesday it is called feudom. "Littleton, Tenured, Sec Ib, Fee simple. In section 11, fee simple is described as the largest form of inheritance. Ib. In modern English tenures, the term fee signifies an inheritable estate, being the highest and most extensive interest the common man or noble, other man than the King, could have in the feudal system. 2 Blackstone's Commentaries, p. 106. Thus, the term fee simple absolute in Common Law England denotes the most and best title a person could have as long as the King allowed him to retain possession of (own) the land. It has been commented that the basis of English land law is the ownership of all realty by the sovereign. From the crown, all titles flow. The original and true meaning of the word "fee" and therefore fee simple absolute is the same as fief or feud, this being in contradiction to the term "allodium" which means or is defined as a man's own land, which he possess merely in his own right, without owing any rent or service to any superior. Wendell v Crandall. 1 N.Y. 49 (1848).

Therefore on common –Law England practically everybody who was allowed to retain land, had the type of fee simple absolute often used or defined by court, a fee simple that grants or gives the occupier as much of a title as the "sovereign" allows such occupier to have at that

43

time.  The term became a synonym with the supposed ownership of land under the feudal system of England at common law.  Thus, even though the word absolute was attached to the fee simple, it merely denoted the entire estate that could be assigned or passed to heirs, and the fee being operative word: fee simple absolute dealt with the entire fief and its visibility and inheritability. Friedman v Steiner, 107 iii. 131 (1883).  If a fee simple absolute in Common-law England denoted or was synonymous with only as much title as the king allowed his barons to posses, then what King have by the way of a title?

The king of England held ownership of land under a different title and with far greater powers than any of his subjects.  Though the people of England held fee titles to their land, the King actually owned all the land in England through his allodial title, and though all the land was in the feudal system, none of the fee simple titles were of equal weight and dignity with the King's title, the land always remaining allodial in favor of the King.  Gilsbert of Mons, Chronique, Ch 43, p 75 (ed Vanderkindere).   Thus is relatively easy to deduce that allodial lands and title are the highest form of lands and titles known to Common-Law.  An estate of inheritance without conditions, belonging to the owner, and alienable by him, transmissible to his heirs absolutely and simply, is an absolute estate in perpetuity and the largest possible estate a man can have, being in fact allodial in it nature.  Stanton v Sullivan , 63 RI. 216,7 A. 696 (189). "The original meaning of perpetuity is an inalienable, indestructible interest:. Bovier's Law Dictionary, Volume III, p 2570.  The king had such a title in land.  As such during the classical feudalistic period of Common-Law England, the king answered to no one concerning the land. Allodial titles, being held by sovereigns. And being full and complete titles allowed the king of England to won and controls the entire country in the form of one large estate belonging to the

Crown. Allodial estates owned by individuals exercising full and complete ownership. on the other hand. existed only to a limited extend in the country of Kent.

<u>In summary of Common- Law England:</u>

(1)     The king was the only person (sovereign) to hold complete and full title to a land (allodial title).

(2)     The people who maintained estates of land. (either called manors or fiefs). held title by fee simple absolute:

(3)     This fee simple absolute in feudal England. being not the full title, did not protect the "owner" if the King found disfavor with the "owner".

(4)     The "owner" therefore had to pay a type of homage to the king or a higher baron each year to discharge the obligation of his fief:

(5)     The "owner" therefore had to pay a type of homage to the king or a higher baron each year to discharge the obligation of his fief:

(6)     This homage of his fief could take the form of a revenue or tax, an amount of grain. or a set and permanent amount of money.

(7)     And therefore as long as the "owner" of the fief is fee simple absolute paid homage to the king or sovereign. who held the entire country under an allodial title. then the "owner" could remain on the property with full rights to sell. devise or pass it by inheritance as if the property was really his.

Section II

Land Ownership in America today the America Feudalistic Society

The private ownership of land in America is one of those rights people have proclaimed to be essential in maintaining this republic. The necessary question in discussing this topic however, is whether ownership of land in America today really is true an complete ownership of land under an allodial concept, or this something much different. In other word, are we living in an actual allodial freehold or are we living in an updated version of feudalistic Common-Law. The answer is crucial determining what rights we have in the protection of our realty against improper seizures and encumbrances by our government and creditors. The answer appears to be extremely clear upon proper reflection of our rights when payments are missed on mortgage, or taxes, for whatever reason, are not paid. If mortgages payments are missed or taxes are not paid we actually fall into disfavor with the parties who have the power, and these powers, through court proceedings or otherwise, take our land as a penalty. When one understand if he is unable to perform as the government or his creditors request and for such failures of ownership system controls his life, and he should recognize the inherent unjustness of such constitutional violations.

The American-bases system of land ownership today consists of three key requirements. These three are warranty deed or some other type of deed purporting to convey ownership of land, title abstracts to chronologically follow the development of these different types of deeds to a piece of property, and title insurance to protect ownership of that land. These three ingredients must work to ensure a systematic and orderly conveyance of a piece of property; none of these three by itself can act to a completely convey possession of the land from one person to another. At least two of three are always deemed necessary to adequately satisfy the legal system and real

46

estate agents that the titles to the property have been placed in the hands of the purchaser and often-time, all three are necessary to properly pass the ownership of the land to the purchaser. Yet do absolute title and therefore the ownership of the land really pass from the seller to purchaser with the use of any one of these three instruments or any combination thereof. None of the three by itself passes the absolute or allodial title to the land, the system of land ownership America originally operated under, and even combined all three cannot convey this absolute type of ownership. What then is the function of these three instruments that are used in land conveyances and what type of title is conveyed by the three? Since the abstract only traces the title and title insurance only ensures the title, the most important and therefore first groups to examine are the deeds that purportedly convey the fee from seller to purchaser.

These deeds include the ones as follows: warranty deed, quit claim deed, sheriffs' deed, trustee's deed, judicial deed, tax deed, wig or any other instrument that purportedly conveys the title. All of these documents state that it conveys the ownership to the land. Each of these, however, is actually a color of title. G. Thompson, Title to real Property, Preparation and examination of Abstracts, Ch 3, Section 73, p.93 (1919). A color of title is that which in appearance is title, but which in reality is not title. Wright v. Mattison, 18 How. (U.S>) 50 (1855). In fact, any instrument may constitute color I is void as a muniment of title. Joplin Brewing Co. v Payne   197 No. 422, 94 S.W. 896 (1906). The Supreme Court of Missouri has stated, "that (when we say a person  has a color of title, whatever may be the meaning of a phrase, we express the idea, at least, that some act has been previously done,....., by which some title, good or bad, to a parcel of land of definite extend had been conveyed to him ." St. Louis v Godman, 29 Mo. 593 (1860). In other words, a color of title is an appearance or apparent title,

47

and "image" of the true title, hence the phrase "color of", which, when coupled with possession purports to convey the ownership of the land the purchase. This however does not say that the color of title is the actual and true title itself, nor does it say what the color of title itself actually conveys ownership. In fact, the claimant or holder of a color of title is not even required to trace the title through the chain down to his instrument. Rawson v Fox. 65 Ill. 200 (1872). Rather it may be said that a color of title is prima facie evidence of ownership of land rights to possession of land until such time as the presumption of ownership is disproved by a better title of the actual title itself. If such cannot be prove to the contrary, the ownership of the land is assumed to have passed to occupier of the land. To further strengthen a color titleholder's position, courts have held that the good faith of the holder to a color of title is presumed in the absence of evidence to the contrary. David v Hall, 92 Ill. 85 (1879); see also Morrison v Norman 47 Il. 477 (1868); and McConnell v Street. 17 Ill. 253 (1855)

With such knowledge of what a color of title is, it is interesting what constitutes colors of title. A warranty deed is like any other deed of conveyance. Mahrenholz V County Board of School Trustees of Lawrence County , et. Al., 93 Iii app. 3d 366 (1981). A warranty deed or deed of conveyance is a color of title, as stated in Dempsey v Burns, 281 iii. 644.650 (1917) (Deeds constitute colors of title); see also Dryden v Newman, 116 Ill. 186 (1886) ( A deed which, on its face, purports to convey a tile, constitutes a claim and color of title); Busch v Huston) 75 Ill 343 (1874) Ciking v Failes, 26 Ill. 508 (1861). A quit claim deed is a color of title as stated in Safford v Stubbs, 117 ILL. 389 (1886); see also 117 ILL. 389 (1886); see also Hooway v Clark. 27 ILL. 483 (1861) and McCellan v Kellog, 17 Ill. 498 (1855). Quit claim deeds can pass the title as effectively as a warrant with full covenants. Grant v Bennett, 96 Ill.

48

513, 525 (1880). See also Morgan v Clayton, 61 Ill. 35 (1871); Brady v Spurck, 27 Ill. 478

(1861); Butterfield v Smith 11 Ill. 485 (1849).  Sheriffs deeds also are colors of title. Kendrick v

Latham, 25 Fla. 819 (1889); as is a judicial deed, Huls v Buntin, 47 Ill. 396 (1865).  The Illinois

Supreme Court went into detail in its determination that a tax deed is only color of title. "There

the complainant seem to have relied upon the tax  deed as conveying to him the fee, and to

sustain such a bill, it was incumbent of him to show that all the requirements of the law had been

complied with. "A simple tax deed by itself is only a color of title. Fee simple can only be

acquired though adverse possessing via payment of taxes; claim and color of title plus seven

years of payment taxes.  Thus any tax deed purports, on its face, to convey title is a good color of

title.  Walker v Converse, 148 Ill. 622, 629 (1894); see also Peadro v Carriker, 168 Ill 570

(1897); Chicago v Middlebrooke,  143 Ill 265 (1892); Piatt County v Gooden, 97 Ill. 84 (1880)

Stubblefield v Borders, 91 Ill. 570 (1897); Colleman v Billings, 89 Ill. 183 (1878); Whitney v

Stevens, 89 Ill. 53 (1878); Thomas v Eckard, 88 Ill. 593 (1878); Halloway v Clarke, 27 Ill. 483

(1861).  A will passes a color of title.  Balwin v Ratcliff, 125 Ill. 376 (1888); Bradley v Rees

113 Ill. 327 (1885) ( A wig can pass only so much as the testator owns, though it may attempt to

pass more).  A trustee's deed, a mortgage and strict foreclosure, Chickering v Failes.  26 Ill. 508,

519 (1861), or any document definings the extent of a disseisor's claim or purported claim.  Cook

v Norton, 43 1111. 391 (1867), all have been held to be colors of title.  In fact, "there is nothing

here requiring a deed, to establish a color of title, and under the former decision of this court,

color of title  may exist without a deed. " Baldwing v Ratcliff, 125 Ill. 376, 383 (1882); County

of Piatt v Goodell, 97 Ill. 84 (1880); Smith v Ferguson, 91 Ill. 304 (1878) Hassett v Ridgely, 49

Ill. 197 (1868); Brooks v Godell,  35 Ill. 392 (1864); McCagg v Heacock, 34 Ill. 476 (1864);

Bride v Watt, 23 Ill. 507 (1860); and Woodward v Blanchard, 16 Ill. 424 (1855). All of the cases being still valid and none being overruled, in effect, the statements in these cases are wells established law. All of the documents described in these cases are the main avenues of claimed land ownership in America today, yet none actually conveys the true and allodial title. They in fact convey something quite different.

When it is state that a color of title conveys only an appearance of or apparent title, such statement is correct but perhaps too vague to be properly understood in its correct legal context. What are useful are the more pragmatic statements concerning titles. A title or color of title, in order to be effective in transferring the ownership purported ownership of the land, must be a marketable or merchantable title.

A marketable or merchantable title is one that is reasonably free from doubt. Austin v Bamum, 52 Minn 136 (1892). This title must be as reasonably free doubts as necessary to not affect the marketability or salability of the property, and must be a title a reasonably prudent person would be willing to accept. Robert v McFadden, 32 tex-Civ. App 47, 74 S.W. 105 (1903). Such a title is often described as one which would ensure to the purchaser a peaceful enjoyment of the property, Barnard v Brown, 112 Mich. 452, 70 N.W. 1038 (1897), and it is stated that such a title must be obvious,evident,apparent,certain sure or indubitable. Ormsby v Graham, 123 Ia. 202, 98 N.W. 724 (1904). Marketable Titlle Acts, which have been adopted in several of the states, generally do not lend themselves to an interpretation that they might operate to provide a new foundation of title based upon a stray, accidental, or interloping conveyance. Their object is to provide, for the recorded fee simple ownership, an exemption from the burdens of old conditions which at each transfer of the property interferes with its marketability.

50

Wichelman v Messner, 83 N.W. 2d 800 (1957). What each of these legal statements in the various factual situations says is that the color of title is never described as the absolute or actual title, rather each says that it is one of the types of titles necessary to convey ownership or apparent ownership. A marketable title, what a color of title must be in order to be effective, must be a title which is good of recent record, even if it may not be the actual title in fact. Close v. Stuyvesant, 132-I11. 607, 24 N.E. 868 (1890). "Authorities hold that to render a title marketable it is only necessary that it shall be free from reasonable doubt; in other words, that a purchaser is not entitled to demand a title absolutely free from every possible suspicion." Cummings v Dolan, 52 Wash. 496, 100 P. 989 (1909). The record being spoken of here is the title abstract and all documentary evidence pertaining to it. "It is an axiom of hornbook law that a purchaser has notice only of recorded instruments that are within his 'chain of title'." 1 R. Patton & C. Patton, Patton on Land Title, Section 69, at 23033. (2nd ed. 1957); Sabo v Horvath, 559 P. 2d 1038, 1043 (Ak. 1976). Title insurance then guarantees that a title is marketable, not absolutely free from doubt.

Thus, under the color or title system used most often in this country today, no individual operating under this type of title system has the absolute or allodial title. All that is really necessary to have a valid title is to have a relatively clean abstract with a recognizable color of title as the operative marketable title within the chain of title. It therefore becomes necessarily difficult, if not impossible after a number of years, considering the inevitable contingencies that must arise and the title disputes that will occur, to ever properly guarantee an absolute title. This is not necessarily the fault of the seller, but it is the fault of the legal and real estate systems for allowing such a diluted form of title to be controlling in an area where it is imperative to have the

51

absolute title. In order to correct this problem, it is important to return to those documents the early leaders of the nation created to property ensure that property remained one of the inalienable rights that the newly established sovereign freeholders could rely on to always exist. This correction must be in the form of restricting or perhaps eliminating the widespread use of marketable title and returning to the absolute title.

Other problems have developed because of the use of a color of title system for the conveyance of land. These problems arise I n the area of terminology that succeed in only confusing and clouding the title to an even greater extent than merely using terms like marketability, salability or merchantability. When a person must also determine whether a title is complete, perfect, good and clear, or whether it is a bad, defective, imperfect and doubtful, there is an obvious possibility of destroying a chain of title because of an inability to recognize what is acceptable to a reasonable purchaser.

A complete title means that a person has the possession, right of possession and the right of property. Dingey v Paxton, 60 Miss. 1038 (1883) and Ehle V Quackenboss, 6 Hill (N.Y.) 537 1844. A perfect title is exactly the same as a complete title, Donovan v Pitcher, 53 Ala. 411 (1875 and Converse v Kellog, 7 Barb. (N.Y.)590 1850; and each simply means the type of title a well informed, reasonable and prudent person would be willing to accept when paying full value for the property. Birge v Bock, 44 Mo. App. 69 (1890). In other words, a complete or perfect title is in reality a marketable or merchantable title, and is usually represented by a color of title.

A good title does not necessarily mean one perfect of record but consist of one which is both of rightful ownership and rightful possession of the property. Bloch v Ryan, 4 App. Cas. 283 (1894). It means a title free from litigation, palpable defect and grave doubts consisting of

52

both legal and equitable title and fairly deducible of record.   Oakley v Cook, 41 N.J. Eq. 350, 7 A.2d 495 (1886). Therefore, the words good title and clear title, just like the words complete title and perfect title, describe nothing more than a marketable title or merchantable title, and as stated above, each can and almost always is represented in a transaction by a color of title. None of these types of title purports to be the absolute, or allodial title, and none of them are that type of title. None of these actually claims to be a fee simple absolute, and since these types of titles are almost always represented by a color of title, none represents that it passes the actual title. Each one does state that it passes what can be described as a title good enough to avoid the necessity of litigation to determine who actually has the title. If such litigation to determine titles is necessary, then the title has crossed the boundaries of usefulness and entered a different category of title descriptions and names.

This new category consists of titles which are bad, defective, imperfect or doubtful. A bad title conveys no property to the purchaser of the estates. Heller v Cohen, 15 Misc. 378, 36 N.Y.S. 668 (1895). A title is defective when the party claiming to own the land has not the whole title, but some other person has title to a part or portion of it. Such a title is the same as no title whatsoever. Place v People, 192 Ill. 160, 61 N.E. 354 (1901); See also Cospertini v Oppermann, 76 Cal. 181, 18 P. 256 (1888). An imperfect title is one where something remains to be done by the granting power to pass the title to the land, Raschel v Perez, 7 Tex. 348 (1851); and a doubtful title is also one which conveys no property to the purchaser of the estate. Heller v Cohen, 15 Misc. 378, 36 N.Y.S. 668 (1895). Every title is described as doubtful which invites or exposes the party holding it

53

to litigation. Herman v Somers, 158 PA.St. 424, 27 A. 1050 (1893). Each of these types of titles describes exactly the same idea stated in many different ways, that because of some problem, defect, or question surrounding the title, no title can be conveyed, since no title exists. Yet in all of these situations some type of color of title was used as the operative instrument. What then makes one color of title complete, good or clear in one situation, and in another situation the same type of color of title could be described as bad, defective, imperfect or doubtful? What is necessary to make what might otherwise be a doubtful title, a good title, is the belief of others in the community, whether or not properly justified, that the title is a good one which they would be willing to purchase. Moore v Williams, 115 N. Y. 586, 22 N.E. 253 (1889). The methods presently used to determine whether a title or color of title is good enough to not be doubtful, are the other two-thirds of the three possible requirements for the conveyance of a good or complete (marketable) title.

These two methods of properly ensuring that a title is a good or complete title are title abstracts, the complete documentary evidence of title, and title insurance. The legal title to land, based on a color of title, is made up of a series of documents required to be executed with the solemnities prescribed by law, and of facts not evidenced by documents, which show the claimant a person to whom the law gives the estate. Documentary evidences of title consist of voluntary grants by the sovereign, deeds if conveyances and wills by individuals, conveyances by statutory or judicial permission, deeds made in connection with the sale of land for delinquent taxes, proceedings under the power of eminent domain, and deeds executed by ministerial or

fiduciary officers. These documentary evidences are represented by the land patent and the colors of title. I G. Thompson, Commentaries on the Modern Law of Real Property, pp. 99-100 (5th ed. 1980). These instruments, relied upon to evidence the title, coupled with the outward assertive acts that import dominion, must be used by the abstractor in compiling the abstract, and the attorney must examine to determine the true status of the title. Ib. The abstract is the recorded history of the land and the various types of titles, mortgages and other liens, claims and interests that have been placed on the property. The abstract can determine the number of times the patent has been redeclared, who owns the mineral rights, what color of title is operable at any particular point in time, and what lien holder is in first position, but it does not convey or even attempt to convey any form of the title itself. As Thompson, supra has stated, it is necessary when operating with colors of titles to have an abstract to determine the status of the operable title and determine whether that title is good or doubtful. Ib. at 101. If the title is deemed good after this lengthy process, then the property may be transferred without doing anything more, since it is assumed that the seller was the owner of the property. This is not to say emphatically that the seller is the paramount or absolute owner. This does not even completely guarantee that he is the owner of the land against any adverse claimants. It is not even that difficult to claim that the title holder has a good title due to the leniency and attitude now evidenced by the judicial authorities toward maintaining a stable and uniform system of land ownership, whether or not that ownership is justified. This however, does not explain the purpose and goal of a title abstract.

An abstract that has been properly brought up simply states that it is presumed the

seller is the owner of the land, making the title marketable, and guaranteeing that he has a good title to sell. This is all an abstract can legally do since it is not the title itself and it does not state the owner has an absolute title. Therefore, the abstract cannot guarantee unquestionably that the title is held by the owner. All of this rhetoric is necessary if the title is good; if there is some question concerning the title without making it defective, then the owner must turn to the last of the three alternatives to help pass a good title. Title Insurance. G. Thompson, Title to Real Property, Preparation and Examination of Abstracts, Ch. III, Section 79, pp. 99-100 (1919).

Title Insurance is issued by title insurance companies to ensure the validity of the title against any defects, against any encumbrances affecting the designated property, and to protect the purchaser against any losses he sustains from the subsequent determination that his title is actually unmarketable. Ib. at 100. Title Insurance extends to any defects of title. Ib. It protects against the existence of any encumbrances, provided only that any judgments adverse to the title shall be pronounced by a court of competent jurisdiction. Ib. It is not even necessary that a defect actually exist when the insurance policy was issued, it is simply necessary that there exists at the time of issuance of the policy and inchoate or potential defect which is rendered operative and substantial by the happening of some subsequent event Since all one normally has is a color of title, the longer a title traverses history, the greater the possibility that the title will become defective. The greater the need for insurance simply to keep the title marketable, the easier it is to determine that the title possessed is not the true, paramount and absolute title. If a person had the paramount title, there would be no need for title insurance,

though an abstract might be useful for record keeping and historical purposes. Title insurance and abstract record keeping are useful primarily because of extensive reliance on colors of title as the operative title for a piece of property.

This then supplies the necessary information concerning colors of title, title abstracts, and title insurance. This does not describe the relationship between the landowner and the government. As was stated in the introduction, in feudal England, the King has the power, right and authority to take a person's land away from him, if and when the King felt it necessary. The question is whether most of the American system of land ownership and titles is in reality any different and whether therefore the American-based system of ownership, is in reality nothing more than a feudal system of land ownership.

Land ownership in America presently is founded on colors of title, and though people believe they are the complete and total owners of their property; under a color of title system this is far from the truth. When people state that they are free and own their land, they in fact own it exactly to the extent the English barons owned their land in Common-Law England. They own their land so long as some "sovereign", the government or a creditor, states that they can own their land. If one recalls from the beginning of this memorandum, it was stated that if the King felt it justified, he could take the land from one person and give such land to another prospective baron. Today, in American color-of-title property law, if the landowner does not pay income tax, estate tax, property tax, mortgages or even a security note on personal property, then the "sovereign", the government or the creditor, can justify the taking of the property

57

and the sale of that same property to another prospective "baron", while leaving the owner with only limited defenses to such actions. The only real difference between this and Common-Law England is that now others besides the King can profit from the unwillingness or inability of the "landowner" to perform the socage or tenure required of every landowner of America. As such, no one is completely safe or protected on his property: no one can afford to make one mistake or the consequences will be forfeiture of the property. If this were what the people in the mid 1700's wanted, there would have been no need to have an American Revolution, since taxes were secondary to having a sound monetary system and complete ownership of the land. Why fight a Revolutionary War to escape sovereign control and virtual dictatorship over the land, when in the 1990's these exact problems are prevalent with this one exception, money now changes hands in order to give validity to the eventual and continuous takeover of the property between the parties. This is hardly what the forefathers strived for when creating the United States Constitution, and what they did strive for is the next segment of the memorandum of law, allodial ownership of the land via the land patent. The next segment will analyze the history of this type of title so that the patent can be properly understood, making it possible to comprehend the patent's true role in property law today.

## Section III

### Land Patents and why they were created

As was seen in the previous sections, there is little to protect the landowner who holds title in the chain of title, when distressful economic or weather condition make it impossible to perform on the debt. Under the color-of-title system, the property, "one of

58

those inalienable rights", can be taken for the non-performance on loan obligations. This type of ownership is similar to the feudal ownership found in the Middle Ages.

Upon defeating the English in 1066 A.D., William the Conqueror pursuant to his 52nd and 58th laws, "...effectually reduced the lands of England to feuds, which were declared to be inheritable and from that time the maxim prevailed there that all lands in England are held from the King, and that all proceeded from his bounty." I. E. Washburn, Treatise on The American Law of Real Property, Section 65, p.44 (6th ed. 1902). All lands in Europe, prior to the creation of the feudal system in France and Germany, were allodial. Most of these lands were voluntarily changed to feudal lands as protection from the neighboring barons or chieftains. Ib. Section 56, at 40. Since no documents protected one's freedom over

his land, once the lands were pledged for protection, the lands were lost forever. This was not the case in England.

England never voluntarily relinquished its land to William I. In fact, were it not for a tactical error by King Harold II's men in the Battle of Hastings, England might never have become feudal. A large proportion of the Saxon lands prior to the Conquest of A.D. 1066 "were held as allodial, that is, by an absolute ownership, without recognizing any superior to whom any duty was due on account thereof." Ib. Section 54, at 39. The mode of conveying these allodial lands was most commonly done by a writing or charter, called a land-boc, or land allodial charter, which, for safekeeping between conveyances, was generally deposited in the monasteries. Ib., Section 54, at 40. In fact, one portion of England, the County of Kent, was allowed to retain this form of land

59

ownership while the rest of England became feudal. Ib., Section 55, at 40. Therefore, when William I established feudalism in England to maintain control over his barons, such control created animosity over the next 2 centuries. F.L. Ganshof, Feudalism, p. 114 (1964). As a result of such dictatorial control, some 25 barons joined forces to exert pressure on the then ruling monarch, King John, to gain some rights not all of which the common man would possess. The result of this pressure at Runnymede became known as the Magna Carta.

The Magna Carta was the basis of modern common law, the common law being a series of judicial decisions and royal decrees interpreting and following that document. The Magna Carta protected the basic rights, the rights that gave all people more freedom and power. The rights that would slowly erode the king's power.

Among these rights was a particular section dealing with ownership of the land. The barons still recognized the king as the lord paramount, but the barons wanted some of the rights their ancestors had prior to A.D. 1066. F. Goodwin, Treatise on The Law of Real Property, Ch. 1, p.3 (1905). Under this theory, the barons would have several rights and powers over the land, as the visible owners, that had not existed in England for 150 years. The particular section of most importance was Section 62 giving the most powerful barons letters of patent, raising their land ownership close to the level found in the County of Kent. Other sections, i.e., 10, 11, 26, 27, 37, 43, 52, 56, 57, and 61 were written to protect the right to "own" property, to illustrate how debts affected this right to own property, and to secure the return of property that was unjustly taken. All these paragraphs were written with the single goal of protecting the "landowner"

60

and helping him retain possession of his land, acquired in the service of the King. from unjust seizures or improper debts. The barons attempted these goals with the intention of securing property to pass to their heirs.

Unfortunately, goals are often not attained. Having repledged their loyalty to King John. the barons quickly disbanded their armies. King John died in 1216, one year after signing the Magna Carta. and the new king did not wish to grant such privileges found in that document. Finally, the barons who forced the signing of the Magna Carta died, and with them went the driving force that created this great charter. The Magna Carta may have still been alive, but the new kings had no armies at their door forcing them to follow policies, and the charter was to a great extent forced to lie dormant. The barons who received the letters of patent, as well as other landholders perhaps should have enforced their rights, but their heirs were not in a position to do so and eventually the rights contained in the charter were forgotten. In-creasingly until the mid-1600's, the king's power waxed. abruptly ending with the execution of Charles I in 1649. By then however, the original intent of the Magna Carta was in part lost and the descendants of the original barons never required, properly protected, free land ownership. To this day, the freehold lands in England are still held to a great extent upon the feudal tenures. See supra Washburn, Section 80,  p. 48. This lack of complete ownership in the land, as well as the most publicized search for religious freedom, drove the more adventurous Europeans to the Americas to be away from these restrictions.

The American colonists however soon adopted many of the same land concepts used in the old world. The kings of Europe had the authority to still exert

61

influence, and the American version of barons sought to retain large tracts of land. As an example, the first patent granted in New York went to Killian Van Rensselaer dated in 1630 and confirmed in 1685 and 1704. A. Getman, Title to Real Property,Principles and Sources of Titles-Compensation For Lands and Waters, Part III, Ch. 17, p. 229 (1921). The colonial charters of these American colonies, granted by the king of England, had references to the lands in the County of Kent, effectively denying the more barbaric aspects of feudalism from ever entering the continent, but feudalism with its tenures did exist for some time. See supra Washburn, Section 55, p. 40. "[I]t may be said that, at an early date, feudal tenures existed in this country to a limited extent." C. Tiedeman, an Elementary Treatise on the American Law of Real Property-, Ch. 11. The Principles of the Feudal System, Section 25, p-22 (2nd ed. 1892). The result was a newly created form of feudal land ownership in America. As such, the feudal barons in the colonies could dictate who farmed their land, how their land was to be divided, and to a certain extent to whom the land should pass. But, just as the original barons discovered, this power was premised in part of the performance of duties for the king. Upon the failure of performance, the king could order the grant revoked and grant the land to another willing to acquiesce to the king's authority. This authority, however, was premised on the belief that people, recently arrived and relatively independent, would follow the authority of a king based 3000 miles away. Such a premise was ill-founded. The colonists came to America to avoid taxation without representation, to avoid persecution of religious freedom, and to acquire a small tract of land that could be owned completely. When the colonists were forced to pay taxes and were required to allow their homes to be occupied

62

by soldiers: they revolted, fighting the British, and declaring their Declaration of Independence.

The Supreme Court of the United States reflected on this independence, in Chisholm v Georgia, 2 Dall. (U.S.) 419 (1793), stating: the revolution, or rather the Declaration of Independence, found the people already united for general purposes, and at the same time, providing for their more domestic concerns, by state conventions, and other temporary arrangements. From the crown of Great Britain, the sovereignty of their country passed to the people of it; and it was then not an uncommon opinion, that the unappropriated lands, which belonged to that crown, passed, not to the people of the colony or states within those limits they were situated, but to the whole people; ... "We, the people of the United States, do ordain and establish this constitution." Here we see the people acting as sovereigns of the whole country; and in the language of sovereignty, establishing a constitution by which it was their will that the state governments should be bound, and to which the state constitutions should be made to conform. It will be sufficient to observe briefly, that the sovereignties in Europe, and particularly in England, exist on feudal principles. That system considers the prince as the sovereign, and the people his subjects; it regards his person as the object of allegiance, and excludes the idea of his being on an equal footing with a subject, either in a court of justice or elsewhere. That system contemplates him as being the fountain of honor and authority; and from his grace and grant, derives all franchises, immunities and privileges; it is easy to perceive, that such a sovereign could not be amenable to a court of justice, or subjected to judicial control and actual constraint. The same feudal ideas run through all

63

their jurisprudence, and constantly remind us of the distinction between the prince and the subject. No such ideas obtain here; at the revolution, the sovereignty devolved on the people; and they are truly the sovereigns of the country, but they are sovereigns without subjects and have none to govern but themselves; the citizens of America are equal as fellow citizens, and as joint tenants in the sovereignty. From the differences existing between feudal sovereignties and governments founded on compacts, it necessarily follows, that their respective prerogatives must differ. Sovereignty is the right to govern; a nation or state sovereign is the person or persons in whom that resides. In Europe, the sovereignty is generally ascribed to the prince; here it rest[s] with the people; there the sovereign actually administers the government; here never in a single instance; our governors are the agents of the people, and at most stand in the same relation to their sovereign, in which the regents of Europe stand to their sovereigns. Their princes have personal powers, dignities, and preeminence; our rules have none but official; nor do they partake in the sovereignty otherwise, or in any other capacity, than as private citizens. (Emphasis added). Ib. at 47071. The Americans had a choice as to how they wanted their new government and country to be formed. Having broken away from the English sovereignty and establishing themselves as their own sovereigns, they had their choice of types of taxation, freedom of religion, and most importantly ownership of land. The American founding fathers chose allodial ownership of land for the system of ownership on this country. In the opinion of Judge Kent, the question of tenure as an incident to the ownership of lands "has become wholly immaterial in this country, where every vestige of tenure has been annihilated." See supra Washburn, Section

64

118, p.59. At the present day there is little, if any, trace of the feudal tenures remaining in the American law of property. Lands in this country are now held to be absolutely allodial. See Supra Tiedeman, Section 25, p. 22. Upon the completion of the Revolutionary War, lands in the thirteen colonies were held under a different form of land ownership. As stated in re Waltz et. al., Barlow v Security Trust & Savings Bank, 240 p. 19 (1925), quoting Matthews v Ward, 10 Gill & J. (Md.) 443 (1839), "after the American Revolution, lands in this state (Maryland) became allodial, subject to no tenure, nor to any services incident there to." The tenure, as you will recall, was the feudal tenure and the services or taxes required to be paid to retain possession of the land under the feudal system. This new type of ownership was acquired in all thirteen states. Wallace v Harmstead, 44 Pa. 492 (1863). The American people, before developing a properly functioning stable government, developed a stable system of land ownership, whereby the people owned their land absolutely and in a manner similar to the king in Common-Law England. As has been stated earlier, the original and true meaning of the word "fee" and therefore fee simple absolute is the same as fief or feud, this being in contradistinction to the term "allodium" which means or is defined as man's own land, which he possesses merely in his own right, without owing any rent or service to any superior. Wendell v Crandall, 1 N.Y. 491 (1848). Stated another way, the fee simple estate of early England was never considered as absolute, as were lands in allodium, but were subject to some superior on condition of rendering him services, and in which such superior had the ultimate ownership of the land. In re Waltz, at page 20, quoting I Cooler's Blackstone, (4th ed.) p. 512. This type of fee simple is a Common-Law term and

65

sometimes corresponds to what in civil law is a perfect title. United States v Sunset Cemetery Co., 132 F. 2d 163 (1943). It is unquestioned that the king held an allodial title which was different than the Common Law fee simple absolute. This type of superior title was bestowed upon the newly established American people by the founding fathers. The people were sovereigns by choice, and through this new type of land ownership, the people were sovereign freeholders or kings over their own land, beholden to no lord or superior. As stated in Stanton v Sullivan, 7 A. 696 (1839), such an estate is an absolute estate in perpetuity and the largest possible estate a man can have, being, in fact allodial in its nature. This type of fee simple, as thus developed, has definite characteristics:

(1)     it is a present estate in land that is of indefinite duration;

(2)     it is freely alienable;

(3)     it carries with it the right of possession; and most importantly;

(4)     the holder may make use of any portion of the freehold without being beholden to any person. 1 G. Thompson, Commentaries on the Modern Law of Real Property, Section 1856, p. 412 (1st ed. 1924).

This fee simple estate means an absolute estate in lands wholly unqualmed by any reservation, reversion, condition or limitation, or possibility of any such thing present or future, precedent or subsequent. Ib.; Wichelman v Messner, 83 N.W. 2d 800, 806 (1957). It is the most extensive estate and interest one may possess in real property. Where, an estate subject to an option is not in fee. See supra 1 Thompson, Section 1856, p. 413. In the case, Bradford v Martin, 201 N.W. 574 (1925), the Iowa Supreme Court went into a lengthy discussion on what the terms fee simple and allodium means in

66

American property law.

The Court stated:

The word "absolutely" in law has a varied meaning, but when unqualifiedly used with reference to titles or interest in land, its meaning is fairly well settled. Originally the two titles most discussed were "fee simple" and "allodium" (which meant absolute). See Bouvier's Law Dictionary. (Rawle Ed.) 134; Wallace v Harmstead, 44 Pa. 492; McCartee v Orphan's Asylum, 9 Cow. (N.Y.) 437, 18 Am. Dec. 516. Prior to Blackstone's time the allodial title was ordinarily called an "absolute title" and was superior to a "fee simple title," the latter being encumbered with feudal clogs which were laid upon the first feudatory when it was granted, making it possible for the holder of a fee simple title to lose his land in the event he failed to observe his feudatory oath. The allodial title was not so encumbered. Later the term "fee simple," however rose to the dignity of the allodial or absolute estate, and since the days of Blackstone the word "in absolute estate" and "fee simple" seen to have been generally used interchangeably; in fact, he so uses them. See Book II, chap. 7, pp. 104-05... And further the words "absolute" and absolutely" usually carry the fee ... By the terms "absolute interest" we understand a complete and perfect interest,....an estate in fee simple is meant. Ib. at 576.

The basis of English land law is the ownership of the realty by the sovereign, from the crown all titles flow. People v Richardson, 269 Ill. 275, 109 N.E. 1033 (1914); see also Matthew v Ward, 10 Gill & J (Md.) 443 (1844). The case, McConnell v. Wilcox, I Scam. (111.) 344 (1837), stated it this way: From what source does the title to the land derived from a government spring? In arbitrary governments, from the supreme head - be

67

he the emperor, king, or potentate; or by whatever name he is known. In a republic, from the law making or authorizing to be made the grant or sale. In the first case, the party looks alone to his letters patent; in the second, to the law and the evidence of the acts necessary to be done under the law, to a perfection of his grant, donation or purchase ... The law alone must be the fountain from whence the authority is drawn; and there can be no other source. Ib. at 367.

The American people, newly established sovereigns in this republic after the victory achieved during the Revolutionary War, became complete owners in their land, beholden to no lord or superior; sovereign freeholders in the land themselves. These freeholders in the original thirteen states now held allodial the land they possessed before the war only feudally. This new and more powerful title protected the sovereigns from unwarranted intrusions or attempted takings of their land, and more importantly it secured in them a right to own land absolutely in perpetuity. By definition, the word perpetuity means, "Continuing forever. Legally, pertaining to real property, any condition extending the inalienability..." Black's Law Dictionary, p. 1027 (5th ed. 1980). In terms of an allodial title, it is to have the property of inalienability forever. Nothing more need be done to establish the ownership of the sovereigns to their land, although confirmations were usually required to avoid possible future title confrontations. The states, even prior to the creation of our present Constitutional government, were issuing titles to the unoccupied lands within their boundaries. In New York, even before the war was won, the state issued the first land patent in 1781, and only a few weeks after the battle and victory at Yorktown in 1783, the state issued the

first land patent to an individual. A Getinan, supral Part III, Ch. 17, State Legislative Grants, pp. 231-32 (1921). In fact, even before the United States was created, New York and other states had developed their own Land Offices with Commissioners. New York's was first established in 1784 and was revised in 1786 to further provide for a more definite procedure for the sale of inappropriate State Lands. Ib. The state courts held, "The validity of letters patent and the effectiveness of same to convey title depends on the proper execution and record... It has generally been the law that public grants to be valid must be recorded. The record is not for purposes of notice under recording acts but to make the transfer effectual." Ib. at 242. Later, if there was deemed to be a problem with the title, the state grants could be confirmed by issuance of a confirmatory grant Ib. at 239. This then, in part, explains the methods and techniques the original states used to pass title to their lands, lands that remained in the possession of the state unless purchased by the still yet un-created federal government, or by individuals in the respective states. Too much this same extent Texas, having been a separate country and republic, controlled and still controls its lands. In each of these instances, the land was not originally owned by the federal government and then later passed to the people and states. This then is a synopsis of the transition from colony to statehood and the rights to land ownership under each situation. This however has said nothing of the methods used by the states in the creation of the federal government and the eventual disposal of the federal lands.

The Constitution in its original form was ratified by a convention of the States, on September 17, 1787. The Constitution and the government formed under it were

69

declared in effect on the first Wednesday of March, 1789. Prior to this time, during the Constitutional Convention, there was serious debate on the disposal of what the convention called the "Western Territories," now the states of Ohio, Indiana, Illinois, Michigan, Wisconsin and part of Minnesota, more commonly known as the Northwest Territory. This tract of land was ceded to the new American republic in the treaty signed with Britain in 1783.

The attempts to determine how such a disposal of the western territories should come about were the subject of much discussion in the records of the Continental Congress. Beginning in September, 1783, there was continual discussion concerning the acquisition of and later disposition to the lands east of the Mississippi River. Journals of Congress. Papers of the Continental Congress, No. 25, 11, folio 255, p. 544-557 (September 13, 1783).

And whereas the United States have succeeded to the sovereignty over the Western territory, and are thereby vested as one undivided and independent nation, with all and every power and right exercised by the king of Great Britain, over the said territory, or the lands lying and situated without the boundaries of the several states, and within the limits above described; and whereas the western territory ceded by France and Spain to Great Britain, relinquished to the United States by Great Britain, and guaranteed to the United States by France as aforesaid, if properly managed, will enable the United States to comply with their promises of land to their officers and soldiers; will relieve their citizens from much of the weight of taxation;..., and if cast into new states, will tend to increase the happiness of mankind, by rendering the purchase of land

70

easy, and the possession of liberty permanent; therefore ... Resolved, that a committee be appointed to report the territory lying without the boundaries of the several states; ... ;and also to report an establishment for a land office. Ib. at 558, reported in the writing of James McHenry.

There was also serious discussion and later acquisition by the then technically nonexistent federal government of land originally held by the colonial governments. Ib. at 562-63. As the years progressed, the goal remained the same, a proper determination of a simple method of disposing of the western lands. "That an advantageous disposition of the western territory is an object worthy the deliberation of Congress." Ib. February 14, 1786, at p. 68. In February, 1787, the Continental Congress continued to hold discussions on how to dispose of all western territories. As part of the basis for such disposal, it was determined to divide the new northwestern territories into medians, ranges, townships, and sections, making for easy division of the land, and giving the new owners of such land a certain number of acres in fee. Journals of Congress, p. 21, February 1787, and Committee Book. Papers of the Continental Congress, No. 190, p. 132 (1788). In September of that same year, there were more discussions on the methods of disposing the land. In those discussions, there were debates in the validity and solemnity of the state patents that had been issued in the past Ib., No. 62, p. 546. Only a week earlier the Constitution was ratified by the conventions of the states. Finally, the future Senate and House of Representatives, though not officially a government for another 1 & 1/2 years, held discussions on the possible creation of documents that would pass the title of lands from the new government

71

to the people. In these discussions, the first patents were created and ratified, making the old land-boc, or land-allodial charters of the Saxon nobles, 750 years earlier, and the letters patent of the Magna Carta, guidelines by which the land would pass to the sovereign freeholders of America. Ib., July 2, 1788, pp. 277-286.

As part of the method by which the new United States decided to dispose of its territories, it created in the Constitution an article, section, and clause that specifically dealt with such disposal. Article IV, Section III, Clause II, states in part, "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." Thus, Congress was given the power to create a vehicle to divest the Federal Government of all its right and interest in the land. This vehicle, known as the land patent, was to forever divest the federal government of its land and was to place such total ownership in the hands of the sovereign freeholders who collectively created the government. The land patents issued prior to the initial date of recognition of the United States Constitution were ratified by the members of Constitutional Congress. Those patents created by statute after March, 1789, had only the power of the statutes and the Congressional at intent behind such statutes as a reference and basis for the determination of their powers and operational effect originally and in the American system of land ownership today.

There have been dozens of statutes enacted pursuant to Article IV, Section III, Clause 11. Some of these statutes had very specific intents of aiding soldiers of wars, or dividing lands in a very small region of one state, but all had the main goal of creating in

the sovereigns, freeholders on their lands, beholden to no lord or superior. Some of the statutes include, 12 Stat 392, 37th Congress, Sass. 11; Ch. 75, (1862) (the Homestead Act); 9 Stat. 520, 31st Congress, Sass. I, Ch. 85 (1850) (Military Bounty, Service Act); 8 Stat.123, 29th congress, Sass. 11 Ch. 8, (1847) (Act to raise additional military force and for other purposes); 5 Stat 4=14, 21st Congress, Sass. II, Ch. 30 (1831); 4 Stat 51, 18th congress, Sass. I., Ch.174 (1824); 5 Stat 52, 18th Congress, Sass. I, Ch.173 (1824); 5 Stat 56, 18th Congress, Sass. I, 172, (1824); 3 Stat. 566, 16th Congress, Sess. 1, Ch. 51, (1820) (the major land patent statute enacted to dispose of lands); 2 Stat 748, 12th Congress, Sess. I. Ch. 99 (1812); 2 Stat, 728, 12th congress, Sess. I, Ch. 77, (1812); 2 Stat. 716, 12th Congress, Sess. 1, Ch. 68, (1812) (the act establishing the General Land. Office in the Department of Treasury); 2 Stat 590, 11th Congress, Sess. 11, Ch. 35, (1810); 2 Stat. 437, 9th Congress, Sess. II Ch. 34, (1807); and 2 Stat 437, 9th Congress, Sess. 1I, Ch. 31, (1807). These, of course, are only a few of the statutes enacted to dispose of public lands to the sovereigns. One of these acts however, was the main patent statute in reference to the intent Congress had when creating the patents. That statue is 3 Stat. 566, supra.

In order to understand the validity of a patent, in today's property law, it is necessary to turn to other sources than the acts themselves. These sources include the Congressional debates and case law citing such debates, For the best answer to this question, it is necessary to turn to the Abridgment of the De bates of Congress, Monday, March 6, 1820, in the Senate, considering the topic "The Public Lands," This abridgment and the actual debates found in it concerns one of the most important of the land Patent statutes, 3 Stat 566, 16th Congress, Sess. I. Ch. 51., Stat.1,

(April 24, 1820).

In this important debate, the reason for such a particular act in general and the protection afforded by the patent in particular were discussed. As Senator Edwards states; But, said, he, it is not my purpose to discuss, at length, the merits of the proposed change. I will, at present, content myself with an effort,  merely, to shield the present settlers upon public lands from merciless speculators, whose cupidity and  avarice would unquestionably be tempted by the improvements which those settlers have made with the sweat of their brows, and to which they have been encouraged by the conduct of the government itself  for though they might be considered as embraced by the letter of the law which provides against intrusion on public lands, yet, that their case has not been considered by the Government as within the mischiefs intended to be prevented is manifest, not only from the forbearance to enforce the law, but from the positive rewards which others, in their situation, have received, by the several laws which have heretofore been granted to them by the same right if preemption which I now wish extended to the present settlers. Ib. at 456.

Further, Senator King from New York stated; He considered the change as highly favorable to the poor man; and he argued at some length, that it was calculated to plant in the new country a population of independent, unembarrassed freeholders; ... that it would cut up speculation and monopoly; that the money paid for the lands would be carried from the State or country from which the p i chaser should remove; that it would prevent the accumulation of an alarming debt, which experience proved never would and never could be paid. Idz at 456-4-57.

74

In other statutes, the Court recognized much of these same ideas. In United States v. Reynes, 9 How. (U.S.) 127 (1850), the Supreme Court stated: The object of the Legislature is manifest. It was intended to prevent speculation by dealing for rights of preference before the public lands were in the market. The speculator acquired power over choice spots, by procuring occupants to seat themselves on them and who abandoned them as soon as the land was entered under their preemption right, and the speculation accomplished. Nothing could be more easily done than this, if contracts of this description could be enforced. The act of 1830, however, proved to be of little avail; and then came, the Act of 1835  (5 Stat 251) which compelled the preemptor to swear that he had not made an arrangements by which the  title might insure to the benefit of anyone except himself, or that he would transfer it to another at any subsequent time. This was preliminary to the allowing of his entry, and discloses the policy of Congress. Ib. At 154.

"It is always to be borne in mind, in construing a congressional grant, that the act by which it is made is a law as well as a conveyance and that such effect must be given to it as will carry out the intent of Congress. That intent should not be defeated by applying to the grant the rules of common law... words of present grant, are operative, if at all, only as contracts to convey. But the rules of common law must yield in this, as in other cases, to the legislative will. Missouri, Kansas & Texas Railway Company v. Kansas Pacific Railway Company, 97 U.S. 491, 497 (1878). The administration of the land system in this country is vested in the Executive Department of the Government, first in the Treasury and now in the Interior Department. The officers charged with the disposal of the public domain under the authority of acts of Congress are

required and empowered to determine the construction of those acts so far as it relates to the extent and character of the rights claimed under them, and to be given, though their actions, to individuals. This is a portion of the Political power of the Government, and courts of justice must never interfere with it Marks v Dickson, 61 U.S. (20 How) 501 (1857): see also Cousin v Blanc's Ex., 19 How. (U.S.) 206, 209 (1856). "The power of Congress to dispose of its land cannot be interfered with, or its exercise embarrassed by any State legislation: nor can such legislation deprive the grantees of the United States of the possession and enjoyment of the property granted by reason of any delay in the transfer of the title after the initiation of proceedings for its acquisition." Gibson v Chouteau, 13 Wal. (U,S.) 92, 93 (1871).

State statutes that give lesser authoritative ownership of title than the patent cannot even be brought into federal court. Langdon v. Sherwood, 124 U.S. 74, 81 (1887). These acts of Congress making grants are not to be treated both law and grant, and the intent of Congress, when ascertained, is to control in the interpretation of the law. Wisconsin R.R. Co. v. Forsythe, 159 U.S. 46 (1895). The intent to be searched for by the courts in a government patent is the intent which the government had at that time, and not what it would have been had no mistake been made. The true meaning of a binding expression in a patent must be applied, no matter where such expressions are found in the document. It should be construed as to effectuate the primary object Congress had in view; and obviously a construction that gives effect to a patent is to be preferred to one that renders it inoperative and void. A grant must be interpreted by the law of the country in force at the time when it was made. The

76

construction of federal grant by a state court is necessarily controlled by the federal decisions on the same subject. The United States may dispose of the public lands on such terms and conditions, and subject to such restrictions and limitations as in its judgment will best promote the public welfare, even if the condition is to exempt the land from sale on execution issued or judgment recovered in a State Court for a debt contracted before the patent issues. Miller v. Little, 47 Cal. 348, 350 (1874). Congress has the sole power to declare the dignity and effect of titles emanating from the United States and the whole legislation of the Govern merit must be examined in the determination of such titles. Bacneu v. Broderick, 38 U.S. 436 (1839). It was clearly the policy of Congress, in passing the preemption and patent laws, to confer the benefits of those laws to actual settlers upon the land- Close v. Stuyvesant, 132 Ill.      607, 617 (1890). The intent of Congress is manifest in the determinations of meaning, force and power vested in the patent. These cases all illustrate the power and dignity given to the patent. It was created to divest the government of its lands, and to act as a means of conveying such lands to the generations of people that would occupy those lands. This formula, "or his legal representatives," embraces representatives of the original grantee in the land, by contract, such as assignees or grantees, as well as by operation of land leaves the question open to inquiry in a court of justice as to the party to whom the patent, or confirmation, should enure. Hogan v Page, 69 U.S. 605 (1864). The patent was and is the document and law that protects the settler from the merciless speculators, from the people that use avarice to unjustly benefit them against an unsuspecting nation. The patent was created with these high and grand intentions, and was created with such

77

intentions for a sound reason.

The settlers as a rule seem to have been poor persons, and presumably without the necessary funds to improve and pay for their land, but it appears that in every case where the settlement was made under the preemption law, the settler ... entered and paid for the land at the expiration of the shortest period at which the entry could be made..." Close v Stuyvesant. 132 III. 607, 623 (1890). We must look to the beneficent character of the acts that created these grants and patents and the peculiar objects they were intended to protect and secure. A class of enterprising, hardy and most meritorious and valuable citizens have become the pioneers in the settlement and improvement of the new and distant lands of the government. McConnell v. Wilcox, I Scam. (III.) 344, 367 (1837). "In furtherance of what I deemed a wise  policy, tending to encourage settlement, and to develop the resources of the country, it invites the heads of families to occupy small parcels of the public land ... To deny Congress the power to make a valid and effective contract of this character ... would materially abridge its power of disposal, and seriously interfere with a favorite policy of the government, which fosters measures tending to a distribution of the lands to actual settlers at a nominal price." Miller v Little, 47 Cal. 348, 351 (1874). The legislative acts, the Statutes at Large, enacted to divest the United States of its land and to sell that land to the true sovereigns of this republic, had very distinct intents. Congress recognized that the average settler of this nation would have little money, therefore Congress built into the patent, and its corresponding act, the understanding that these lands were to be free from avarice and cupidity, free from the speculators who preyed on the unsuspecting nation, and

forever under the control and ownership of the freeholder, who, by the sweat of his brow made the land produce the food that would feed himself and eventually the nation. Even today, the intent of Congress is to maintain a cheap food supply though the retention of the sovereign farmers on the land. United States v Kimball Foods, Inc., 440 U.S. 715 (1979); see also Curry v Block, 541    F. Supp. 506 (1982). Originally, the intent of Congress was to protect the sovereign freeholders and create a permanent system of land ownership in the country. Today, the intent of Congress is to retain the small family farm and utilize the cheap production of these situations, it has been necessary to protect the sovereign on his parcel of land, and ensure that he remain in that position. The land patent and the patent acts were created to accomplish these goals. In other words, the patent or title deed being regular in its form, the law will not presume that such was obtained through fraud of the public right. This principle is not merely an arbitrary rule of law established by the courts; rather it is a doctrine which is founded upon reason and the soundest principles of public policy. It is one which has been adopted in the interest of peace in the society and the permanent security of titles. Unless Baud is shown, this rule is held to apply to patents executed by the public authorities. State v Hewitt-Land Co., 134 P. 474, 479 (1913). It is therefore necessary to determine exact power and authority contained in a patent.

Legal titles to lands cannot be conveyed except in the form provided by law. McGarrahan v Mining Co., 96 U.S. 316 (1877). Legal title to property is contingent upon the patent issuing from the government. Sabo v Horvath, 559

79

P.2d 1038, 1040 (Aka. 1976).

"That the patent carries the fee and is the best title known to a court of law is the settled doctrine of this court. " Marshall v Ladd, 7 Wall. (74 U.S.) 106 (1869).

"A patent issued by the government of the United States is legal and conclusive evidence of title to the land described therein. No equitable interest, however strong, to land described in such a patent; can prevail at law, against the patent." Land Patents. Opinions of the United States Attorney General's Office, (September, 1969).

"A patent is the highest evidence of title, and is conclusive against the government and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal.',' Stone v United States., 2 Wall- (67 U.S.) 765 (1865).

The patent is the instrument which, under the laws of Congress, passes title from the United States and the patent when regular on its face, is conclusive evidence of title in the patentee. When there is a confrontation between two parties as to the superior legal title, the patent is conclusive evidence as to ownership. Gibson v Chouteau, 13 Wall. 912 (1871).

Congress having the sole power to declare the dignity and effect of its titles has declared the patent to be the superior and conclusive evidence of the legal title. Bagnell v Brodrick, 38 U.S. 438 (1839).

"Issuance of a government patent granting title to land is the most accredited

type of conveyance known to our law." United States v Creek Nation, 295 U.S. 103, 111 (1935); see also United States v Cherokee Nation, 474 F.2d 628, 634 (1973).

"The patent is prima facie conclusive evidence of the title." Marsh v Brooks, 49 U.S. 223, 233 (1850).

"A patent, once issued, is the highest evidence of title, and is o final determination of the existence of all facts." Walton v United States, 415 F.2d 121, 123 (10th Cir. 1969); see also United States v Beaman, 242 F. 876 (1917); File v Alaska, 593 P.268, 270 (1979)

(When the federal government grants land via a patent, the patent is the highest evidence of title). Patent rights to the land is the title in fee, City of Los Angeles v Board of Supervisors of Mono County, 292 P.2d 539 (1956), the patent of the fee simple, Squire v Capoeman, 351 U.S. 16 (1956); and the patent is required to carry the fee. Carter v Rubby, 166 U.S. 493, 496 (1896); see also Klais v Danowski, 129 N.W. 2d 414, 422 (1964) (Interposition of the patent or interposition of the fee title). The land patent is the muniment of title, such title being absolute in its nature, making the sovereigns absolute freeholders on their lands. Finally, the patent is the only evidence of the legal fee simple title. McConnell v Wilcox, 1 Scam (ILL.) 381, 396 (1837). All these various cases and quotes illustrate one statement that should be thoroughly understood at this time; the patent is the highest evidence of title and is conclusive of the ownership of land in courts of competent jurisdiction. This however, does not examine the methods or possibilities of challenging a land patent.

In Hoover et al. v Scheimer, 64 U.S. (23 How.) 235 (1859), the United States

Supreme Court stated, "I affirm that a patent is unimpeachable at law, except, perhaps, when it appears on its own face to be void; and the authorities on this point are so uniform and unbroken in the courts, Federal and State, that little else will be necessary beyond a reference to them." Ib. at 240 (1859). A patent cannot be declared void at law, nor can a party travel behind the patent to avoid it. Ib. A patent cannot be avoided at law in a collateral proceeding unless it is declared void by statute, or its nullity indicated by some equally explicit statutory denunciations. Ib. One perfect on its face is not to be avoided, in a trail at law, by anything save an elder patent. It is not to be affected by evidence or circumstances which might show that the impeaching party might prevail in a court of equity. Ib. at 243. A patent is evidence, in a court of law, of the regularity of all previous steps to it, and no facts behind it can be investigated. Ib. A patent cannot be collaterally avoided at law, even for fraud. Ib. at 245. A patent, being a super, for title, must of course, prevail over colors of title; nor is it proper for any state legislation to give such titles, which are only equitable in nature with a recognized legal status in equity courts, precedence over the legal title in a court of law. Ib. at 246. The Hooper case has many of the maxims that apply to the powers and possible disabilities of a land patent, however there is extensive case law in the area.

The presumptions arise, from the existence of a patent, evidencing a grant of land from the United States, that all acts have been performed and all facts have been shown, which prerequisites to its issuance are, and that the right of the party, grantee therein, to have it issued, has been presented and passed upon by the proper authorities. Green v Barber, 66 N.W. 1032 (1896). As stated in Bouvier's Law Dictionary, Vol. II, p. 1834

(1914): Misrepresentations knowingly made by the application for a patent will justify the government in proceedings to set it aside, as it has a right to demand a cancellation of a patent obtained by false and fraudulent misrepresentations. United States v Manufacturing Co., 128 U.S. 673 (1888); but courts of equity cannot set aside, annul, or correct patents or other evidence of title obtained from the United States by fraud or mistake, unless on specific averment of the mistake or fraud, supported by clear and satisfactory proof, Maxelll Land Grant Cancellation, 1 How. (U.S.) 552 (1850): although a patent fraudulently obtained by one knowing at the time that another person has a prior right to the land may be set aside by an information in the nature of a bill in equity filed by the attorney of the United States for the district in which the land lies: Ib. A court of equity, upon a bill tiled for that purpose; will vacate a patent of the United States for a tract of land obtained by mistake fthe officers of the land office, in order that a clear title may be transferred to the previous purchaser; Hughes v United States, 4 Wall. (U.S.) 232 (1866); but a patent for land of the United States will not be declared void merely because the evidence to authorize its issue is deemed insufficient by the court: Milliken v Star- lings lessee, 16 Ohio 61. A state can impeach the title conveyed by it to a grantee only 01 y a bill in chancery to cancel it, either for fraud on the part of the grantee or mistake of law; and until so canceled it cannot issue to any other party a valid patent for the same land. Chandler v Manufacturing Co. 149 U.S. 79 (1893).

Other cases espouse these and other rules of law. A patentee can be deprived of his rights only by direct proceedings instituted by the government or by parties acting in

its name, or by persons having a superior title to that acquired through the government. Putnum v Ickes, 78 F.2d 233, cert denied 296 U.S. 612 (1935).

It is not sufficient for the one challenging a patent to show that the patentee should not have received the patent; he must also show that he, as the challenger, is entitled to it. Kale v United States, 489 F. 2d 449, 454 (1973).

A United States patent is protected from easy third party attacks. Fisher v Rule, 248 U.S. 314, 318 (1919); see also Hoofnagle v Anderson, 20 U_S. (7 Wheat.) 212 (1822).

A patent issued by the United States of America so vests the title in the lands covered thereby, that it is the further general rule that, such patents are not open to collateral attack. Thomas v Union Pacific Railroad Company, 139 F. Supp. 588, 596 (1956). See also State v Crawford, 475 P. 2d 515 (Ariz. App. 1970) (A patent is prima facie valid, and if its validity can be attacked at all, the burden of proof is upon the defendant); State v Crawford, 441 P. 2d 586, 590 (Ariz. App. 1968) (A patent to land is the highest evidence of title and may not be collaterally attacked); Dredge v Husite Company, 369 P. 2d 676, 682 (1962) (A patent is the act of legally instituted tribunal, done within its jurisdiction, and passes the title. Such a patent is a final judgment as well as a conveyance and is conclusive upon a collateral attack). Absent some facial invalidity, the patents are presumed valid. Murray v State, 596 P. 2d 805, 816 (1979). The government retains no power to nullify a patent except through a direct court proceeding. United States v Reimann, 504 F.2d 135 (1974); See Also Green v Barker, 66 N.W. 1032, 1034 (1896) (The doctrine announced was that the deed upon its face, purported to have been issued in pursuance of the law, and was therefore only assailable in a direct proceeding

84

by aggrieved parties to set it aside). Through these cases, it can be shown that the patent which passes the title from the United States to the sovereigns, and was created to keep the speculators from the land, is only assailable in a direct proceeding for fraud or mistake. In no other situation is it allowable for the courts, to simply eliminate the patent. One question that may arise is what do the courts mean by a collateral attack and what can be done by courts of equity if a collateral attack is presented?

Perhaps the easiest means of defining a collateral attack is to show the converse corollary, or a direct attack on a patent as was stated in the previous paragraphs, a direct attack upon a land patent is an action for fraud or mistake brought by the government or a party acting in its place. Therefore, a collateral attack, by definition, is any attack upon a patent that is not covered within the direct attack list. Perhaps the most prevalent collateral attack in property law today is a mortgage or deed of trust foreclosure on a color of title. In these instances, it is determined that the complete title and interest in the land is purchased by the mortgagee or another in his place. Such a determination displaces the patentee's ownership of the title without the court ever ruling that the patent was acquired through fraud or mistake. This is against public policy, legislative intent, and the overwhelming majority of case law. Therefore, it is now necessary to determine the patent's role in American property law today, to see what powers the courts of equity have in protecting the rights of the challengers of patents.

The attitude of the Courts is to promote simplicity and certainty in title transactions; thereby they follow what is in the chain of title and not what is outside. Sabo v Horvath, 559 P.2d 1038, 1044 (1976). However, in equity courts, title under a patent

from the government is subject to control, to protect the rights of parties acting in a fiduciary capacity. Sanford v. Sanford, 139 U.S. 290 (1891). This protection however does riot include the invalidation of the patent. The determination of the land department in matters cognizable by it, in the alienation of lands and the validity of patents, cannot be collaterally attacked or impeached. Ib. Therefore the courts have had to devise another means to control the patentee, if not the patent itself, as stated in Raestle v Whitson, 582 P.2d 170, 172 (1978). "The lend patent is the highest evidence of title and is immune from collateral attack. This does not preclude a court from imposing a constructive trust upon the patentee for the benefit of the owners of an "equitable interest". This then explains the most equitable way a court may effectively restrict the sometimes harsh justice handed down by a strict court of law. Equity courts will impose a trust upon the patentee until the debt has been paid. As has been stated, a patent cannot be collaterally attacked: therefore the land cannot be sold or taken by the courts unless there is strong evidence of fraud or mistake. However, the courts can require the patentee to pay a certain amount at regular intervals until the debt is paid, unless of course, there is a problem with the validity of the debt itself. This is the main purpose of the patent in this growing epidemic of farm foreclosures that defy the public policy of Congress. the legislative intent of the Statutes at large, and the legal authority as to the type of land ownership possessed in America. Why then is the rate of foreclosures on the rise?

Titles to land today, as was stated earlier in this memorandum, are normally in the form of colors of title. This is because of the trend in recent property law to maintain the status quo. The rule in most jurisdictions and those which have adopted a grantor-grantee

index in particular, is that a deed outside the chain of title does not act as a valid conveyance and does not serve notice of a defect of title on a subsequent purchaser. These deeds outside the chain of title are known as "wild deeds." Sabo v Horvath, 559 P.2d 1038, 1043 (1976); See also Porter v Buck, 335 So.2d 369, 371 (1976); The Exchange National Bank v Lawndale National Bank, 41 ILL.2d 316, 243 N.E.2d 193, 195-96 (1968) (The chain of title for purposes of the marketable title act, may not be founded on a wild deed. These stray, accidental, or interloping conveyances are contrary to the intent of the marketable title act, which is to simplify and facilitate land title transactions); and Manson v Berkman, 356 ILL. 20, 190 N.E. 77, 79 (1934). This liberal construction of what constitutes a valid conveyance has led to a thinning of the title to a point where the absolute and paramount title is almost impossible to guarantee. This thinning can be directly attributed to the constant use of the colors of title. Under the guise of being the fee simple absolute, these titles have operated freely, but in reality, they evidence something much different.

It was said in Common-Law England, that when a title was not completely alienable and not the complete title, it was not a fee simple absolute. Rather it was some type of contingent conveyance that depended on the performance of certain tasks before the title was considered to be absolute. In fact, normally the title never did develop into a fee simple absolute. These types of conveyance were evidenced in part by the operable word, sin, the conveyance and in part by manner in which the granter could reclaim the property. If the title automatically reverted to the grantor upon the happening of a contingent action, then the title was by a fee simple determinable. Scheller v Trustees of

Schools of Township, 41 North, 67 ILL. App.3d 857, 863 (1978). This is evidenced most closely today by deeds of trust in some states. If it required a court's ruling to reacquire the land and title, then the transaction and title were held by a fee simple with a condition subsequent. Mahrenholz v Country Board of Trustees of Lawrence County, 93 111. App.3d 366, 370-74 (1981). This is most closely evidenced by a mortgage, in a lien or intermediate theory state. These analogies may be somewhat startling and new to some, but the analogies are accurate. When a mortgage is acquired on property, the mortgagee steps into the position of a grantor with the authority to create the contingent estate as required by the particular facts. This is exactly what the grantor in Common-Law property law could acquire. All the grantor had to do was choose a particular type of contingency and use the necessary catch-words, and almost invariably the land would one day be refused due to a violation of the contingency. In today's property law, the color of title has little power to protect the landowner. When the sovereign is unable to pay the necessary principal and interest on the debt load, then the catch-words and phrases found in the deed of trust or mortgage become operational. Upon the occurrence of that event, the mortgagee or speculator, having through a legal myth acquired the position of a grantor, is in a position to either automatically receive the property simply by advertising and selling it, or can acquire the position of the grantor and eventually the possession of the property by a court proceeding.

   In Common-Law, the grantor of a fee simple determinable where the contingency was broken or violated could automatically take the land from the grantee holder, by force if necessary. If however, the grant was a fee simple upon condition subsequent the

88

grantor, when the contingency broken, had to bring a legal proceeding to declare the

contingence broken, to declare the grantee in violation, and to order the grantee to vacate

the premises. These situations, though under different names and proceedings, occur every

day in America. Is there really any serious debate therefore, that the colors of title used today,

with the creation of a lien upon the property, become fee simple determinable and fee

simples upon condition subsequent? Is this a legitimate method of ensuring a stable

and permanent system of land ownership? If the color of title is weak, then how

strong is a mortgage or deed of trust placed on the property?

Fee simple estates may be either legal or equitable. In each situation it is the

largest estate in the land that the law will recognize. Hughes v Miller's Mutual Fire Insurance

Co., 246 S.W. 23 (1922). If a mortgagee, upon the creation of a mortgage or deed of trust, steps

into the shoes of the grantor upon a conditional fee simple, does it then mean the mortgagee

has acquired one of the two halves of a fee simple, when cases have shown the fee

simple is only evidenced by a patent? Actually, courts have held in many states that a

mortgage is only a lien. United States v Certain Interests in Property in Champaign

County, State of Illinois, 165 F. Supp. 474, 480 (1958) (In Illinois and other lien theory

states, the mortgagee has only a lien and not a vested interest in the leasehold); See also

Federal Farm Mortgage Corp. v Ganswer 146 Neb. 635, 20 N.W. 2d 689 (1945) (Even

after a condition is broken or there is a default on a mortgage, a mortgagee only has an

equitable lien which can be enforced in proper proceedings); South Omaha Bank v Levy,

95 N.W. 603 (1902) Strict foreclosure will not lie when mortgagor holds the legal title);

First National Bank v Sercreant, 65 Neb. 394, 91 N.W. 595 (1902) (Mortgagee cannot

demand more than is legally due); Morrill v Skinner, 57 Neb. 164, 77 N.W. 375 (1898) (Mortgage conveys no estate but merely creates a lien); Barber v Crowell, 55 Neb. 571, 75 N.W. 1109 (1898) (Mortgage is mere security in form of conditional conveyance). Soeer v Hadduck, 31 Freeman (Ill.) 439, 443 (1863) (Assignments or conveyances of mortgages do not convey the fee simple; rather they hold only security interests). These cases amply illustrate that a mortgage or deed of trust is only a lien, in lien and intermediate theory states. Even in title theory of mortgages states, courts of equity have determined that the fee simple title is not really conveyed, either in its equitable or legal state. See supra Barber, at 1110. A fee simple estate still exists even though the property is mortgaged or encumbered. Hughes v Miller's Mutual Fire Insurance Co., 246 S.W. 23, 24 (1922). In fact, a creditor asserting a lien (mortgage) must introduce evidence or proof that will clearly demonstrate the basis of his lien. United States v United States Chain Company, 212 F. Supp. 171 (N.D. M. 1962). If a mortgagee, even in the title theory states, has only a lien, yet when the mortgage or deed of trust is created he has a fee simple determinable or condition subsequent, then obviously the color of title used as the operative title has little force or power to protect the sovereign freeholder. Nor can it be said that such a color of title is useful in the maintenance of stable and permanent titles. The patent, in almost all cases, has been originally issued to the first purchaser from the government. Theoretically then the public policy, Congressional intent from the 1800's, and the Congressional intent of the last few decades should protect the sovereign in the enjoyment and possession of his freehold. This however is not the case. Instead, vast mortgaging of the land has

90

occurred. The agriculture debt alone has risen to over $220,000,000,000 in the past

three decades. This is in part due to the vast expansion of mortgaged holdings and in part

due to the rural sector's inability to repay existing loans requiring the increased

mortgaging of the land. This is in exact contradiction to the public policy and legislative

intent of maintaining stable and simplistic land records, yet marketable titles (colors of

'title) were supposed to guarantee such records. Wichelman v Messner, 83 N.W. 2d 800,

805 (1957). Colors of title are ineffective against mortgages and promote the instability

and complexity of the records of land titles by requiring abstracts and title insurance

simply to guarantee a marketable title. Worse, a practice has prevailed in some of the

states... of permitting actions to determine titles to be maintained upon warrants for land

(warranty deeds) and other titles not complete or legal in their character. This practice is

against the intent of the Constitution and the Acts of Congress. Bagnell v Broderick, 38

U.S. 438 (1839). Such lesser titles have no value in actions brought in federal courts not

withstanding a State legislature which may have provided otherwise. Hooper et. al. v.

Scheimer, 64 U.S. (23 How.) 235 (1859). It is in fact possible that the state legislatures

have even violated the Supremacy Clause of the United States Constitution. These

actions are against the intent of the founding fathers and against the legislative intent of

the Congressman who enacted the statutes at large creating the land patent or land

grant. This patent or grant, since the land grant has been stated to be another name for

the patent, the terms being synonymous, Northern Pacific Railroad Co. v Barden, 46 F.

592, 617 (1891); prevented  every problem that was created by the advent of colors of

title, marketable titles, and mortgages. Therefore it is necessary to determine the validity

91

of returning to the patent as the operative title.

Patents are issued (and theoretically passed) between sovereigns... and deeds are executed by persons and private corporations without these sovereign powers. Leading Fighter v Count of Gre2orv, 230 N.W. 2d 114, 116 (1975). As was stated earlier, the American people in creating the Constitution and the government formed under it, made such a document and government as sovereigns, retaining that status even after the creation of the government. Chisholm v Georgia, 2 Dail. (U.S.) 419 (1793). The government as sovereign passes the title to the American people creating in them sovereign free holders. Therefore, it follows that the American people, as sovereigns, would also have this authority to transfer the fee simple title, through the patent, to others. Cases have been somewhat source in this area, but there is some case law to reinforce this idea. In Wilcox v Callo1Kay, 1 Wash. (Va.) 318, 38-41 (1823); the Virginia Court of Appeals heard a case where the patent was brought up or reissued to the parties four separate times. Some patents were issued before the creation of the Constitutional United States  government, and some occurred during the creation of that government The courts determined the validity of those patents, recognizing each actual acquisition as being valid, but reconciling the differences by  finding the first patent, properly secured with all the necessary requisite acts fulfilled, carried the title. The other patents and the necessary requisition of a new patent each time yielded the phrase "lapsed patent." A lapsed patent being one that be required to perfect the title. Ib. Subsequent patentees take subject to any reservations in the original patent. State v Crawford, 441 P.2d 586, 590 (1968). A patent regularly issued by the government is the best and only evidence of a

92

perfect title. The actual patent should be secured to place at rest any question as to validity of entries (possession under a claim and color of title). Young v Miller, 125 So. 2d 257, 258 (1960). Under the color of title act, the Secretary of Interior may be required to issue a patent if certain conditions have been met, and the freeholder and his predecessors in title are in peaceful, adverse possession under claim and color of title for more than a specified period. Beaver v United States; 350 F.2d 4, cert. denied, 387 U.S. 937 (1965). A description which will identify the lands (and possession) is all that is necessary for the validity of the patent Lossing v Shull, 173 S.W. 2d 1, 1 Mo. 342 (1943). A patent to two or more persons creates presumptively a tenancy in common in the patentees. Stoll v Gottbreht, 176 N.W. 932, 45 N.D. 158 (1920). A patent to be the original grantee or his legal representatives embrace the representatives by contract as well as by law. Reichert v Jerome H. Sheip. Inc., 131 So. 229, 222 Ala. 133 (1930). A patent has a double operation. In the first place, it is documentary evidence having the dignity of a record of the evidence of the title or such equities respecting the claim as to justify its recognition and later confirmation. In the second place, it is a deed of the United States, or a title deed, as a deed, its operation is that of a quitclaim or rather of a conveyance of such interest as the United States possess in the land, such interest in the land passing to the people or sovereign freeholders. 63 Am. Jur. 2d Section 97, p. 566. Finally, the United States Supreme Court, in Surnma Corporation v California ex rel. State Lands Coinmission, etc. 80 L. Ed. 2d 237 (1984), made determinations as to the validity of a patent confirmed by the United States through the Treaty of Guadalupe Hidalgo, 9 Stat. 631 (1851). The State of California attempted to

93

acquire land that belonged to the corporation. The State maintained that there was a public trust easement granting to the State authority to take the land without compensation for public use. The corporation relied in part on the intent of the treaty, in part on the intent of the patent and the statute creating it, and in part in the requisite challenge date of the patent expiring. The Summa Court followed the lengthy dissertation of the dissenting judge on the California Supreme Court, See 31 Cal.3d 288, dissenting opinion, in determining that the patent which had been the apparent operative title throughout the years, was paramount and the actions by the State were against the manifest weight of the Treaty and the legislative intent of the patent statutes. Ib. at 244-46. In each of these cases it is stated that the patent, through possession, or claim and color of title, or through the term "his heirs and assigns forever", or through the necessary passage of title at the death of a joint tenant or tenant in common, is still the operable title and is required to secure the peaceful control of the land. These same ideas can also apply to state patents for lands that went to the state or remained in the hands of the state upon admission into the Union. Oliphant vs. Frazho, 146 N.W.2d 685, 686-87 (1966); Fiedler v Pipers, 107 Sold 409, 411-12 (1958) (Not even the State could be heard to question the validity of a patent signed by the Governor and the Register of the State Land Office). No government can object to the intent and creation of a patent after such is issued, unless issued through fraud or mistake. The patent, either federal or state, has ark intent to create sovereign freeholders in the land protected from the speculators, (any lending institution speculates upon land), and a public policy to maintain a simplistic, stable and permanent system of land records. Land patents were designed to effectively insure that

94

this intent and policy were retained. Colors of title cannot provide this type of stability, since such titles are powerless against liens, mortgages, when the free holder is unable to repay principle and interest on the accompanying promissory note. Equity will entertain jurisdiction at the instance of the owner of fee of lands to remove a cloud upon his title created by the sale of the premises and a deed issued thereto under a decree of foreclosure of a mortgage thereon.  Hodgen v Guttery, 58 Free. (ILL.) 431, 438 (1871) (though this case dealt with an improper sale of land covered by a patent, any forced sales of lands covered by a patent is improper in view of the policy and intent of Congress). Equity however will protect the mortgagee who stands to lose his interest in the property, thereby requiring a trust to be created until the debt is erased, making partners of the creditor and debtor. What then exists is a situation where the patent should be declared (confirmed or reissued), to protect the sovereign freeholder and to re-institute the policy and intent of Congress. The patent as the paramount title, fee simple absolute, cannot be collaterally attacked, but when a debt cannot be paid, immediately placing the creditor in jeopardy, the courts will impose a constructive trust until the new "partners" can mutually eliminate the debt. If the debt cannot be satisfactorily removed, it is still possible, considering the present intent of the government, to maintain sovereign freeholders on the property immune from the loss of the land, since it is Congress' intent to keep the family farm in place. No use of colors of title to act as the operative title is inappropriate considering the rising number of foreclosures and the inability of the colors of title to restrain a mortgage or lien. However, the lending institutions, speculators on the land, maintain that the public policy of the country

95

includes the eradication of the sovereign freeholders in the rural sector in an effort to implant upon the country, large corporate holdings. This last area must be effectively met and eliminated.

To those who framed the Constitution, the rights of the States and the rights of the people were two distinct and different things. Throughout their debates they had two objects foremost in their minds. First, to create a strong and effective national government, and secondly to protect the people and their rights from usurpation and tyranny by government. The people's liberties and individual rights and safeguards were to be kept forever beyond the control and dominion of the legislatures of the States, whom they distrusted, and against whom they so carefully guarded themselves. If such control and domination and unlimited powers were given to a few legislatures they could override every one of the reserved rights covered by the first ten Amendments (the Bill of Rights); they could change the government of limited powers to one of unlimited powers; they could declare themselves hereditary rulers; they could abolish religious freedoms; they could abolish free speech and the right of the people to petition for redress; they could not only abolish trial by jury, but even the rights to a day in court; and most importantly they could abolish free sovereign ownership of the land. The whole literature of the period of the adoption of the Constitution and the first ten amendments is one great testimony to the insistence that the Constitution must be so amended as to safeguard unquestionably the rights and freedoms of the people so as to secure from any future interference by the new government, matters the people had not already given into its control, unless by their own consent. United States v Sprague,

282 U.S. 716, 723- 726 (1930).The problem is not in the lending institutions that simply practice good business on their part. The problem is the loss of freedoms and the present interference with allodial sovereign ownership lies with the state legislatures that created law, or marketable title acts, that claimed to enact new simplistic, stable land titles and actually created a watered-down version of the fee simple absolute that requires complicated tracing and protection, and is ineffective against mortgage foreclosures. None of these problems would occur if the patent were the operable title again, as long as the sovereigns recognized the powers and disabilities of their fee simple title. The patent was meant to keep the sovereign freeholder on the land, but the land was also to be kept free of debt, since that debt was recognized in 1820 as un-repayable, and today is un-repayable. The re-declaration of the patent is essential in the protection of the rural sector of sovereign freeholders, but also essential is the need to impress the state legislatures that have strayed from their enumerated powers with the knowledge that they have enacted laws that have defeated the intent and goal of man since the middle ages. That intent, of course, is to own a small tract of land absolutely, whether by land or patent, on which the freeholder is beholden to no lord or superior. The patent makes sovereign freeholders of each person who own his/her land. A return to the patent must occur if those sovereign freeholders wish to protect that land from the encroachment of the state legislatures and the speculators that benefit from such legislation.

97

### Land Patents, Ejectments and Estoppels

### The United States of America

### A Republic under God

1.   In case of ejectment, where the question is who has the legal title, the patent of the Government is unassailable.  Sanford v. Sandford, 139 US 642.

2.   The transfer of legal title (patent) to public domain gives the transferee the right to possess and enjoy the land transferred.  Gibson v Chouteau, 80 US 92.

3.   A patent for land is the highest evidence of title and is conclusive as against the government and all claiming under junior patents or title.  United States v Stone, 2 Us 525.

4.   The presumption being that it (patent) is valid and passes the legal title.  Minter v Crommelin, 18 US 87.

5.   Estoppel has been sustained as against a municipal corporation (county) Beadle v Smyer 209 US 393.

6.   A court of law will not uphold or enforce an equitable title to land as defense to action of ejectment.  Johnson v Christina, 128 US 374: Doe V Aiken, 31 FED. 393.

7.   When congress has prescribed the conditions upon which portions of the public domain may be alienated (to convey, to transfer), and has provided that upon the fulfillment of the conditions be United States shall issue a patent to the purchaser, then such land is not taxable by state. Sargent v Herrick & Stevens, 221 US 404: Northern P.R. Co. v Trail Count y 115 US 600.

8. The patent alone passes land from the United States to the Grantee and nothing passes a perfect title to public lands but a patent. Wilcox v Jackson, 13 Peter (US) 498.

9. Patents and other evidences of title from the United States government are not controlled by state recording laws and shall be effective, as against subsequent purchasers, only from the time of their record in the county. Lomax v Pickering, 173 US 26.

10. In federal courts the patent is held to the foundation of title at law. Fenn v Holmes, 21 Howard 481.

11. Congress has the sole power to declare the dignity and effect of titles emanating from the United Sates and the whole legislation of the government, in reference to the public lands, declare the patent to the superior and conclusive evidence of the legal title. Until it issues, the fee is in the Government, which by the patent passes to the grantee, and he is entitled to enforce the possession in ejectment. Bagnell v Broderick 13 Peer (US 436.

12. In ejectment the legal title must prevail, and patent of the United States to public lands pass that title; it cannot be assailed collaterally on the ground that false and perjured testimony was used to secure it. Steel v St. Louis Smelting and Refining Co. 106 US 417.

13. A patent certificate, or patent issued, or confirmation made to an original grantee or his legal representatives of the grantee or assignee by contract, as well as by law, Hogan v Pace, 69 US 605.

14. In federal courts, the rule that ejectment cannot be maintained on a mere equitable title is strictly enforced, so that ejectment cannot be maintained on mere entry made with a register and receiver, but only on the patent, since the certificates of the officers of the land department vest in the locator only equitable title. This rule prevails in the federal